# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>        Applicant,<br><br>    v.<br><br>Covington & Burling LLP,<br><br>        Respondent. | Misc. No. 1:23-mc-00002 |

## DECLARATION OF GERALD HODGKINS IN SUPPORT OF
## COVINGTON & BURLING LLP'S OPPOSITION TO SEC'S APPLICATION

1. I, Gerald Hodgkins, am a partner at Covington & Burling LLP ("Covington") and a member of the District of Columbia Bar.

2. I submit this declaration in support of Covington's opposition to the Securities and Exchange Commission's ("SEC") application for an order requiring compliance with Request No. 3(a) of its March 21, 2022, subpoena.

3. I have personal knowledge of the following facts and would be prepared to testify to them at an evidentiary hearing.

**Professional Background**

4. I have been a practicing attorney for more than 25 years. Near the start of my legal career, I served as a law clerk to the Hon. Charles R. Richey of the U.S. District Court for the District of Columbia.

5. Before joining Covington in 2018, I spent 20 years as an attorney in the SEC's Division of Enforcement. I began my career at the SEC as a staff attorney in 1997. I became a

branch chief in 1999, an assistant director in 2007, and an associate director in 2010.

6. An associate director is a senior management position with the Division of Enforcement. As an associate director, I reported to the directors of the Division of Enforcement and supervised approximately 30 attorneys and staff responsible for investigating violations of and otherwise enforcing the federal securities laws.

7. During my career at the SEC, I oversaw more than 100 enforcement actions covering the entire breadth of the SEC's law enforcement authority.

8. In 2020, I was elected to the steering committee for the Corporation, Finance and Securities Law Community of the D.C. Bar and currently serve as the steering committee's chairman.

**Background on Covington**

9. Covington is a multinational law firm headquartered in Washington, D.C. The firm numbers more than 1,300 lawyers working in 13 offices across the world, including in New York, Los Angeles, San Francisco, Beijing, and Shanghai.

10. One of Covington's early hires, Dean Acheson, later served as Secretary of State for President Truman, and the firm remains a destination for senior government officials entering private practice. Covington counts more than 100 former government officials and diplomats among its ranks, including former Attorney General Eric Holder. Many of these attorneys have continued to perform policy-related or government-facing work once they entered private practice at Covington.

11. Covington's clients include publicly traded companies and other SEC-regulated entities. Many of these clients have long-term relationships with Covington and retain the firm to handle multiple different matters.

**Hafnium Cyberattack and SEC Subpoena**

12. On March 2, 2021, Microsoft disclosed vulnerabilities in its Exchange Server software. *See* Microsoft Security Blog, *Hafnium Targeting Exchange Servers with 0-Day Exploits* (Mar. 2, 2021), https://tinyurl.com/3h9m4wnh. Because Covington uses Exchange Server software, and in light of these public reports, Covington launched an investigation to determine whether unauthorized parties had gained access to its network.

13. Through its investigation, Covington determined that a threat actor had been able to compromise Covington's Exchange environment. My partner David N. Fagan has submitted a declaration concurrently herewith that provides additional information concerning the cyberattack and Covington's response.

14. On March 21, 2022, approximately one year after Covington discovered the cyberattack, the SEC served a document subpoena on Covington regarding the Hafnium cyberattack. The subpoena, a copy of which is available as Exhibit A to the Ney Declaration, Dkt. 1-2, contained 10 document requests seeking, among other things, information about how Covington discovered the cyberattack, the dates of the intrusion, and the nature of the unauthorized activity.

15. Because of my extensive experience at the SEC, two of Covington's general counsels, Stephen Anthony and Mr. Fagan, asked me to work with them on preparing the firm's response to the subpoena. I have always considered my work on this matter to be directed by them and to be Covington's work product.

16. Covington produced documents to the SEC or provided detailed narrative responses to nine of the 10 document requests on April 18, May 26, and May 27, 2022. Covington corrected a typographical error in its April 18 letter and served a revised copy on the SEC on April 27, 2022.

Through outside counsel, Covington also served privilege objections and a privilege log on June 9, 2022.

17. Among other information it provided in response to the subpoena, Covington disclosed the dates or date ranges on which the unauthorized activity took place and gave a detailed description of the search activity conducted by the threat actor.

18. Covington objected to the lone remaining request, No. 3, which demanded that Covington produce the names of public company clients affected by the cyberattack, along with copies of "[a]ny" communications with those clients concerning the cyberattack. Request No. 3 also demanded that Covington identify the "nature of the suspected unauthorized activity" concerning each client, "including when the activity took place and the amount of information that was viewed, copied, modified, or exfiltrated if known (e.g., number of files, size of files, etc.)." Ney Decl. Ex. A.

19. Based on Covington's analysis, we determined that Request No. 3 applied to 298 of Covington's public company and other SEC-regulated clients. For ease of reference, I will refer to this group of clients as "public company clients" throughout the declaration.

20. Request No. 3 constitutes a serious intrusion into the privacy and confidentiality of Covington's attorney-client relationships. Covington could not identify its affected clients or produce the requested communications consistent with the attorney-client privilege and the firm's fiduciary duties, duty of loyalty, and duty of confidentiality it owes its clients, including under D.C. Rule of Professional Conduct 1.6.

21. To communicate our objections to Request No. 3, Mr. Anthony and I participated in multiple telephone conferences with SEC staff attorneys. Those calls took place on April 4, May 10, May 13, May 18, May 20, and June 1, 2022.

22. Covington's outside counsel, Gibson, Dunn & Crutcher LLP, served the staff attorneys with detailed written objections to Request No. 3 on June 10, 2022. A true and correct copy of those objections is available at Exhibit B to the Ney Declaration, Dkt. 1-2.

23. After receiving Covington's objections, the SEC's staff attorneys responded by letter on July 14, 2022, offering to narrow the subpoena slightly. The staff asked for (1) all information the SEC previously had requested to which any Covington client would consent, (2) the names of public company clients affected by the Hafnium cyberattack, (3) a description of the scope of the impact on those clients, and (4) Covington's initial communication informing those clients of the cyberattack. A true and correct copy of the SEC's letter is available as Exhibit C to the Ney Declaration.

24. Covington communicated the SEC's proposal to the 298 public company clients covered by the subpoena. One client consented to the revised request, and Covington produced responsive information regarding that client—namely, the client's name, Covington's initial communication to that client, and a description of the information accessed, including the subject matter of accessed communications—to the SEC on July 29, 2022.

25. On August 3, 2022, the staff offered another purported compromise: that Covington could produce "**only the names of its impacted public company clients** in the first instance." A true and correct copy of the SEC's proposal is available as Exhibit 1 to the Meeks Declaration, filed concurrently herewith.

26. Covington again communicated the staff's proposal to the remaining 297 affected clients. One additional client agreed to the disclosure of its name, and only its name, to the SEC. Covington promptly identified that client to the SEC on August 12, 2022.

27. No other Covington client has consented to the release of its name or any

communications concerning the cyberattack to the SEC.

28. Our outside counsel at Gibson Dunn continued negotiating with the SEC regarding the issues associated with Request No. 3. During that time, Gibson Dunn requested a meeting with the staff attorneys and their supervisors, SEC Associate Directors Melissa Hodgman and Carolyn Welshhans. The requested meeting took place on August 24, 2022. I participated in that meeting, along with several of my partners and our outside counsel at Gibson Dunn. The meeting lasted approximately one hour.

29. The purpose of the meeting was to provide the Associate Directors with nonpublic information concerning the cyberattack and to explain the bases for Covington's conclusion that the threat actor was engaged in an intelligence operation and did not target Covington's system to obtain information that could be used to engage in profitable trading in violation of the securities laws.

30. At the conclusion of that meeting, the SEC's attorneys stated that, even if corporate espionage was not the primary purpose of the cyberattack, the possibility remained that the threat actor may have gained incidental access to material, nonpublic information ("MNPI") that could be exploited for insider trading. The SEC therefore asked Covington to canvass its affected files to determine whether those affected files may have contained MNPI.

**Covington's Internal Review**

31. Following the August 24 meeting, Covington undertook an intensive, multi-week review of its affected files, spearheaded by a team of seven review attorneys working under my supervision and at the direction of Mr. Anthony. Applying multiple factors—including the materiality standard from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and other applicable cases; my experience at the SEC; and factual and other background we obtained from the relevant

Covington lawyers—the review team flagged any information that could reasonably constitute MNPI during the relevant time frame. In so doing, the team also identified and reviewed publicly available sources to determine whether information in Covington's files was publicly known at the time of the cyberattack.

32. Where the review attorneys were uncertain whether information might qualify as MNPI, they followed up with Covington lawyers who were knowledgeable about the relevant files to make a more informed determination. The custodians of those files helped to refine the review team's analysis of whether the information was material and whether it was public at the time the threat actor gained access to it.

33. I supervised the team's work and reviewed its conclusions for every affected client to ensure I concurred in the analysis. I also participated in some of the meetings the review team held with the custodians of the relevant files.

34. All told, Covington's attorneys spent approximately 490 hours conducting this internal review.

35. At the end of our review, we concluded that the threat actor had *not* accessed MNPI for 291 of the 298 public company clients affected by the SEC's subpoena.

36. We could not rule out that the threat actor accessed MNPI for the remaining seven out of 298 affected clients. Covington did not make a definitive judgment that the information accessed by the threat actor in fact constituted MNPI—only that the information in these files had indicia of being MNPI.

37. When the foregoing analysis was completed, Gibson Dunn conveyed this information to the SEC's staff attorneys on Covington's behalf. Gibson Dunn also provided information concerning the types of client files that potentially contained MNPI (e.g., documents

referencing nonpublic acquisitions or deals) and those that did not (e.g., documents relating to general legal advice).

38. When the SEC's staff attorneys had several rounds of follow-up questions during conferences with Gibson Dunn, I worked diligently with the review team to provide answers without identifying confidential information concerning Covington's affected clients.

39. On November 15, 2022, the SEC's staff attorneys informed Gibson Dunn that the extensive internal review Covington undertook at the request of the SEC had not resolved the parties' dispute regarding Request No. 3, and the SEC believed the parties had reached an impasse.

40. Two days later, Covington again communicated the SEC's position to the 296 public company clients who had not consented to the release of information in response to Request No. 3. None of them changed their position.

41. The SEC filed an application to enforce the subpoena on January 10, 2023. *See* Dkt. 1.

**SEC's Tools for Investigating Insider Trading**

42. The SEC's application for an order enforcing Request No. 3 states that it is seeking the names of Covington clients so "it can use its investigatory tools to identify any suspicious trading in those companies' securities." SEC Mem. of Law, Dkt. 1-1, at 8.

43. The SEC does not require the names of Covington's clients to identify any suspicious trading that may have resulted from the unauthorized activity on Covington's network.

44. During my two-decade career at the SEC, I became very familiar with the SEC's investigatory tools for detecting and monitoring suspicious trading activity. During my SEC career, I was involved in approximately 40 insider trading investigations, 10 of which led to authorized enforcement actions by the Commission, including the SEC's action against 32

defendants alleged to have participated in a scheme to steal and trade on nonpublic information about corporate announcements by hacking into newswire services.  *See SEC v. Dubovoy*, No. 2:15-cv-06076 (D.N.J. Aug. 10, 2015).

45.     Among other tools, the Division of Enforcement's Market Abuse Unit has an Analysis and Detection Center that uses highly sophisticated data analytics tools to identify unusual trading patterns in public company securities that often surround important events, such as mergers and acquisitions or the announcement of earnings.  The Enforcement Division regularly brings insider trading actions based on trades identified by this unit and often describes its work in press releases.  *See, e.g.*, SEC Release No. 2022-129, *SEC Files Multiple Insider Trading Actions Originating from the Market Abuse Unit's Analysis and Detection Center* (July 25, 2022), https://www.sec.gov/news/press-release/2022-129.

46.     Self-regulatory organizations ("SRO"), including national securities exchanges such as the New York Stock Exchange and NASDAQ, are required by law to enforce compliance with the securities laws by their "members" and "persons associated with" their members.  15 U.S.C. §§ 78f(b), 78s(g).

47.     In addition to the SEC, the various securities exchanges have "established systems and procedures to monitor trading in their markets and identify instances of . . . potential insider trading."  SEC.gov, *Staff Paper on Cross-Market Regulatory Coordination* (Dec. 15, 2020), https://tinyurl.com/5n6f3unp.  The exchanges then report this information to the SEC.

48.     The Financial Industry Regulatory Authority ("FINRA") is a government-authorized, not-for-profit organization that oversees U.S. broker-dealers.  FINRA has entered into regulatory services agreements with 19 exchanges that operate 26 stock and options markets.  Robert W. Cook, *Equity Market Surveillance Today and the Path Ahead* (Sept. 20, 2017),

https://tinyurl.com/4edt8ykp. "Through these agreements, and in coordination with the exchanges, FINRA's surveillance now canvasses 99.5 percent of U.S. stock market trading volume and about 65 percent of U.S. options trading activity." *Id.*

49. FINRA's Office of Fraud Detection and Market Intelligence conducts "front-line insider trading surveillance for the U.S. markets" using a proprietary tool that tracks "unusual price or volume movements in stocks." *See* FINRA, *5 Surprising Facts About Insider Trading* (May 3, 2017), https://tinyurl.com/w92th5p6. FINRA routinely reports potential insider trading activity to the SEC.

50. If a public company announces a material event that causes its stock price to move, such as a merger or government investigation, the exchanges or FINRA will typically examine trading in that company's securities in the time period leading up to the announcement to determine whether an unusual number of trades or other suspicious activity took place. If appropriate, the results of those examinations are sent to the SEC.

51. These powerful investigative tools afford the SEC multiple alternative means to detect suspicious trading activity in the securities markets that do not require Covington to divulge the names of its clients.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746. Executed on February __13__, 2023

_____
Gerald Hodgkins