**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　　*Applicant*,

　　v.

COVINGTON & BURLING LLP,

　　　　　　　　　*Respondent*.

Case No. 1:23-mc-00002

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**
**AS AMICUS CURIAE IN SUPPORT OF RESPONDENT**

## SOURCE OF AUTHORITY TO FILE

The Court set forth in its January 24, 2023, Order that pursuant to its discretion under Local Civil Rule 7(o)(1), it will accept amicus curiae briefs in this case without an accompanying motion for leave to file.  Order to Show Cause, ECF 9.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................iv

INTEREST OF AMICUS CURIAE......................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................4

ARGUMENT ......................................................................................................8

    I.    Credible assurances of confidentiality given to legal clients and journalistic sources alike are essential, as courts and legislatures have widely recognized. ...........................................................................8

    II.   Absent a stronger news media policy like that at DOJ, adopting the SEC's legal theory here could increase the potential for agency overreach....................................................................................11

CONCLUSION ................................................................................................19

CERTIFICATE OF COMPLIANCE ...................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Cusamano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998)...........................5

*Gonzales v. NBC, Inc.*, 194 F.3d 29, 35 (2d Cir. 1998) ............................................9

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .................................4

*Schoen v. Schoen*, 5 F.3d 1289, 1295 (9th Cir. 1993)................................................5

*Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) .......................................4, 7, 8

**Other Authorities**

Aaron Schaffer, *SEC suit 'charts a perilous new course,' hacked law firm says*, Washington Post (Feb. 2, 2023), https://perma.cc/MZC5-C8RJ ..........................3

Alanna Madden, *Murder of journalist tests the limits of Nevada's shield law*, Courthouse News Serv. (Nov. 4, 2022) https://perma.cc/XKW9-XFDH..............8

*Amending the Department of Justice subpoena guidelines*, Reporters Committee for Freedom of the Press (accessed Feb. 17, 2023) https://www.rcfp.org/attorney-general-guidelines/ ...............................................................................................13

Barbara Starr, *I'm a journalist and the Trump administration tried to secretly obtain tens of thousands of my emails*, CNN (June 14, 2021) https://perma.cc/G3SY-TNKS ................................................................................8

Br. For Amici Curiae the Reporters Committee and 48 Media Organizations in Support of Non-Party Respondent, *People v. Juarez*, APL-2017-00057 (N.Y.) (filed Oct. 6, 2017) ................................................................................................2

Br. Of Amicus Curiae the Reporters Committee and 19 Media Organizations in Support of Reporter Jamie Kalven's Mot. To Quash Subpoena, *People v. March*, Case No. 2017-CR-9700 (Ill. Cir. Ct.) (filed Nov. 26, 2018) ...............................1

Br. Of Amicus Curiae the Reporters Committee in Support of Non-Party Witness John Sepulvado, *United States v. Patrick*, Civil No. 3:16-cr-00051-BR (D. Or.) (filed Feb. 22, 2017) .............................................................................................2

Br. Of Amicus Curiae the Reporters Committee in Support of Petitioner, *Shriner v. the Superior Court of the State of California, et al.*, Case No. E076320 (Cal. Ct. Appeal) (filed Dec. 23, 2020)...................................................................................1

Br. Of Amicus Curiae the Reporters Committee, *Subpoena Duces Tecum to KIRO TV, Inc., et al.*, Case No. 20-0-616926 (Wash. Super. Ct.) (filed June 29, 2020) .1

Bruce D. Brown & Gabe Rottman, *A major milestone in the fight for press freedom*, CNN (Oct. 28, 2022) https://perma.cc/525Z-GB6U .......................11, 14

Gabe Rottman, *Ice Enacts New Policy Protecting Media from Legal Demands*, Lawfare (June 29, 2022) https://perma.cc/YD2F-H86Z .......................................15

*Gov't obtains wide AP phone records in probe*, Associated Press (May 13, 2013) https://perma.cc/V636-N7E2 ...............................................................................13

Hamed Aleaziz, *The Trump Administration is Trying to Force Buzzfeed News to Divulge its Sources With a Subpoena*, Buzzfeed News (Dec. 4, 2020) https://perma.cc/6J6H-AJM3 ...............................................................................15

Hon. John N. Mitchell, "Free Press and Fair Trial: The Subpoena Controversy," Address Before the House of Delegates of the American Bar Association (Aug. 10, 1970) .....................................................................................................12

Jessica Corso, *SEC Commissioner Uneasy Over Suit Against Covington*, Law360 (Jan. 12, 2023) https://perma.cc/XX2U-EZEZ .......................................................9

Mayze Teitler & Samuel Aber, *The Law of the Reporter's Privilege is a Mess. A Federal Shield Law Could Help Fix It*,  Knight First Amendment Institute, (Aug. 13, 2021) https://perma.cc/BD63-CGHD ............................................................8

Memorandum on Use of Compulsory Process to Obtain Information from, or Records of, Members of the News Media, Office of the Attorney General (July 19, 2021) https://perma.cc/VSH7-84HL .............................................................14

*Mitchell Sets Rules Limiting Subpoenas Issued to Newsmen*, New York Times (Aug. 11, 1970) https://perma.cc/TQ6W-X8MQ...................................................12

Policy Statement of the Securities and Exchange Commission Concerning Subpoenas to Members of the News Media, SEC (April 12, 2006) https://www.sec.gov/news/press/2006/2006-55.htm....................................7, 9, 11

Press Release, Department of Justice, Attorney General Garland Announces
Revised Justice Department News Media Policy (Oct. 26, 2022),
https://perma.cc/TKX3-BE5X ................................................................5

*Reporter's Privilege Compendium*, Reporters Committee, (accessed Feb. 11, 2022)
https://www.rcfp.org/reporters-privilege/ ............................................7

Robert Pear, *Justice Dept. Restricts Subpoenas for Reporters and Phone Records*,
N.Y. Times (Nov. 13, 1980) https://perma.cc/YE38-UWJK .............................13

Roger Yu, *Newsrooms may revisit security after AP hacking*, USA Today (April
23, 2012) https://perma.cc/XGP5-Y6XX...........................................17

Sean Lyngaas, *U.S. journalists targeted by foreign hackers who show sophisticated
understanding of American politics*, CNN (July 14, 2022)
https://perma.cc/P9PK-H29G...........................................................17

*SEC Announces Enforcement Results for FY22*, U.S. Securities and Exchange
Comm'n (Nov. 15, 2022) https://www.sec.gov/news/press-release/2022-206....16

Stephen Labaton, *U.S. Subpoenas 2 Dow Writers, Then Backs Off*, New York
Times, (Feb. 25, 2006) https://perma.cc/ESR4-8DKN .........................................8

*Washington's Culture of Secrets, Sources and Leaks*, PBS (Feb. 13, 2007),
https://perma.cc/N9QD-ZVPD...............................................................4

## Regulations

17 C.F.R. § 202.10 ..................................................................7

Policy Regarding Obtaining Information From or Records of Members of the
News Media; and Regarding Questioning, Arresting, or Charging Members of
the News Media, 28 CFR 50.10 (Oct. 26, 2022)..................................5, 14, 15, 16

## INTEREST OF AMICUS CURIAE

Amicus the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated association of reporters and editors with no parent corporation and no stock.[1]  The Reporters Committee was founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee has a strong interest in ensuring robust safeguards against intrusive government investigations that can reveal the identity of confidential journalistic sources.  To that end, the Reporters Committee, along with other news media organizations, often appears as amicus curiae in courts around the country to oppose the compelled testimony of journalists or production of journalistic work product or documentary material.  *See, e.g.*, Br. Of Amicus Curiae the Reporters Committee in Support of Petitioner, *Shriner v. the Superior*

_____

[1]     No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

1

*Court of the State of California, et al.*, Case No. E076320 (Cal. Ct. Appeal) (filed

Dec. 23, 2020); Br. Of Amicus Curiae the Reporters Committee, *Subpoena Duces*

*Tecum to KIRO TV, Inc., et al.*, Case No. 20-0-616926 (Wash. Super. Ct.) (filed

June 29, 2020); Br. Of Amicus Curiae the Reporters Committee and 19 Media

Organizations in Support of Reporter Jamie Kalven's Mot. To Quash Subpoena,

*People v. March*, Case No. 2017-CR-9700 (Ill. Cir. Ct.) (filed Nov. 26, 2018); Br.

For Amici Curiae the Reporters Committee and 48 Media Organizations in Support

of Non-Party Respondent, *People v. Juarez*, APL-2017-00057 (N.Y.) (filed Oct. 6,

2017); Br. Of Amicus Curiae the Reporters Committee in Support of Non-Party

Witness John Sepulvado, *United States v. Patrick*, Civil No. 3:16-cr-00051-BR (D.

Or.) (filed Feb. 22, 2017).

Although this case does not directly implicate members of the news media,

the legal theory advanced by Applicant here could apply equally to a newsroom

subpoena issued by the SEC, and the SEC has, in the past, issued subpoenas to

journalists to disclose source information.  As such, the Reporters Committee

respectfully submits that crediting the SEC's theory in this case—which would

effectively vitiate any confidentiality interest in the information sought because of

Respondent's status as the *victim* of a cyberattack—could have far-reaching and

unintended consequences beyond this particular matter.  Specifically, it could chill

the free flow information from confidential sources to the press and, therefore the

public, by signaling to SEC investigators that an unauthorized intrusion into a news

organization's computer systems could provide adequate basis for legal process to

identify those confidential sources.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

In November 2020, Respondent Covington & Burling LLP ("Covington")

was subject to a cyberattack that compromised information about its clients,

including 298 entities regulated by the SEC.  *See* Aaron Schaffer, *SEC suit 'charts*

*a perilous new course,' hacked law firm says*, Wash. Post (Feb. 2, 2023),

https://perma.cc/MZC5-C8RJ.  Covington notified the affected clients and

voluntarily cooperated with the FBI to conduct an investigation into the

cyberattack.  *Id.*  Thereafter, the SEC opened an investigation into "any violations

of the federal securities laws" in connection with the cyberattack.  Decl. W.

Bradley Ney Ex. A.  And, in March 2022, the SEC issued a subpoena to

Covington, calling for production of information, including the names of

Covington's SEC-regulated clients impacted by the hack.  *Id.*  As Covington

details in its briefing, it has attempted to comply with the subpoena, providing all

of the requested information save client names.  Resp't's Mem. in Opp'n 2–3, ECF

No. 14.  It asserts the attorney-client privilege, ethical responsibilities, and legal

limits on government investigations that obligate it to resist the SEC's demand that

it identify its clients.  The SEC has brought this action to enforce its subpoena.

While the SEC seeks the names of confidential law firm clients, not

confidential journalistic sources, the legal theory it advances—that there is no

confidentiality protection, whatsoever, for this information—could apply to the

identities of confidential journalistic sources as well.  As such, the Reporters

Committee writes as amicus to offer the following two points to aid the Court in its

consideration and resolution of this matter.

First, members of the news media play an essential role in democracy by

informing the public about matters of public concern.  *Richmond Newspapers, Inc.*

*v. Virginia*, 448 U.S. 555 (1980).  To fulfill that role, journalists at times must

depend on confidential sources—sources that will not come forward or speak to a

member of the news media without an assurance of confidentiality.  *See*

*Washington's Culture of Secrets, Sources and Leaks*, PBS (Feb. 13, 2007),

https://perma.cc/N9QD-ZVPD.

Disclosure of the identity of confidential journalistic sources may jeopardize

their safety or livelihood and thus discourage others sources from coming forward,

ultimately stanching the free flow of newsworthy information to the public.  In

light of this concern, federal courts, including in this District and in the U.S. Court

of Appeals for the D.C. Circuit, have long recognized the privacy interests that

inhere in the journalist-source relationship, and the importance of protections

against compulsory process aimed at journalistic work product and the identities of

confidential sources.  *See, e.g.*, *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981)

("Compelling a reporter to disclose the identity of a source may significantly

interfere with this newsgathering ability; journalists frequently depend on

informants to gather news, and confidentiality is often essential to establishing a

relationship with an informant."); *Cusamano v. Microsoft Corp.*, 162 F.3d 708, 714

(1st Cir. 1998) ("Courts afford journalists a measure of protection from discovery

initiatives in order not to undermine their ability to gather and disseminate

information.") (internal quotation marks and citations omitted); *Schoen v. Schoen*,

5 F.3d 1289, 1295 (9th Cir. 1993) (noting "a 'lurking and subtle threat' to the

vitality of a free press if disclosure of non-confidential information 'becomes

routine and casually, if not cavalierly, compelled'").

Second, other executive branch agencies impose more stringent limits on

their ability to access confidential journalistic source information.  Most notably,

the Justice Department recently released a historic revision of its longstanding

policy governing the use of compulsory process to acquire records from or of

journalists, which effectively bars the use of subpoenas to identify confidential

journalistic sources, with very limited exceptions.  Policy Regarding Obtaining

Information From or Records of Members of the News Media; and Regarding

Questioning, Arresting, or Charging Members of the News Media, 28 C.F.R. §

50.10 (the "News Media Guidelines"); *see also* Press Release, Department of

Justice, Attorney General Garland Announces Revised Justice Department News

Media Policy (Oct. 26, 2022), https://perma.cc/TKX3-BE5X ("Because freedom of

the press requires that members of the news media have the freedom to investigate

and report the news, the new regulations are intended to provide enhanced protection to members of the news media from certain law enforcement tools and actions that might unreasonably impair newsgathering.").  While the SEC has a 2006 policy limiting its ability to issue subpoenas to journalists, that policy is much weaker than the current DOJ policy, or even the earlier DOJ policy, which dates back to 1970.  As such, enforcement of the SEC's subpoena here would raise concerns of potential overreach vis-à-vis members of the new media.

Indeed, broad reaching consequences could follow from enforcement of the SEC's subpoena.  The agency seeks sensitive information about a law firm's clients as part of a sweeping investigation into possible violations of securities laws because the law firm itself was the victim of a crime.  Other than its internal policy, the SEC has articulated no limiting principle that would preclude a similar subpoena against any other entity with professional confidentiality obligations— including journalists and news organizations with ethical obligations to resist demands to reveal the identities of confidential sources.

For the reasons herein, amicus respectfully urges this Court to reject the sweeping assertion of investigative authority advanced by the SEC.

## ARGUMENT

I.   **Credible assurances of confidentiality given to legal clients and journalistic sources alike are essential, as courts and legislatures have widely recognized.**

Crediting the SEC's argument here could signal to the agency that issuing legal process to compel the disclosure of other sensitive confidential information—including journalistic source identities—is limited only by the SEC's relatively weak internal policy implemented in 2006.  17 C.F.R. § 202.10; Policy Statement of the Securities and Exchange Commission Concerning Subpoenas to Members of the News Media, SEC (April 12, 2006), https://www.sec.gov/news/press/2006/2006-55.htm (hereinafter "SEC Policy Statement").

There is broad, national consensus among courts that the newsgathering process is legally protected.  The First Amendment, for instance, provides a layer of protection against compulsory process targeting journalists.  *Zerilli*, 656 F.2d at 711.  And most states and the District of Columbia have enacted statutes that further protect journalists from being forced to name their confidential sources.  *Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press (accessed Feb. 11, 2022), https://www.rcfp.org/reporters-privilege/.  In many jurisdictions, however, the identities of confidential journalistic sources are entitled only to qualified protection.  For example, though the D.C. Circuit has held that "in the ordinary case, [a] civil litigant's interest in disclosure should yield to the

journalist's privilege," it also has recognized that, in some civil cases, the privilege must be overcome, notwithstanding the consequent harms to newsgathering. *Zerilli*, 656 F.2d at 712.  Furthermore, some jurisdictions and procedural postures lack meaningful protections for journalistic source identity and materials entirely. Mayze Teitler & Samuel Aber, *The Law of the Reporter's Privilege is a Mess. A Federal Shield Law Could Help Fix It*,  Knight First Amend. Inst. (Aug. 13, 2021), https://perma.cc/BD63-CGHD.

Where protections are not robust, government efforts to obtain journalistic work product, including confidential source communications and materials, are not only possible—they are routine and well-documented.  *E.g.*, Alanna Madden, *Murder of journalist tests the limits of Nevada's shield law*, Courthouse News Serv. (Nov. 4, 2022), https://perma.cc/XKW9-XFDH; Barbara Starr, *I'm a journalist and the Trump administration tried to secretly obtain tens of thousands of my emails*, CNN (June 14, 2021), https://perma.cc/G3SY-TNKS.  Indeed, the SEC's current policy limiting the use of compulsory process against journalists was promulgated after a 2006 instance where the SEC subpoenaed journalists for information about conversations with stock traders and analysts, before backing down following inquiries from the press.  *See* Stephen Labaton, *U.S. Subpoenas 2 Dow Writers, Then Backs Off*, N.Y. Times (Feb. 25, 2006), https://perma.cc/ESR4-8DKN; SEC Policy Statement, *supra*.  Notably, an SEC spokesperson at the time

explicitly left open the possibility that the agency might subpoena journalists again in the future, notwithstanding the SEC's then-new policy, which is in effect today. *Id.* And SEC Commissioner Mark Uyeda has himself drawn parallels between the instant subpoena to Covington and prior subpoenas the agency directed at journalistic sources for their communications with members of the media. Jessica Corso, *SEC Commissioner Uneasy Over Suit Against Covington*, Law360 (Jan. 12, 2023), https://perma.cc/XX2U-EZEZ.

Enforcement of the SEC's subpoena here would support the proposition that the agency may demand production of third-party information that implicates significant privacy interests. Armed with its desired outcome here, the agency could invoke the same rationale to seek confidential work product, including the names of sources, from members of the press, when the newsroom has been the victim of a cyberattack. Courts have long recognized the potential for such subpoenas to stifle reporting by chilling reporter-source communications. *See Gonzales v. NBC, Inc.*, 194 F.3d 29, 35 (2d Cir. 1998) (noting the threat of compelled disclosure to the news media's ability to perform its duties when potential sources may be "deterred from speaking to the press, or insist[] on remaining anonymous, because of the likelihood that they w[ill] be sucked into litigation"). The Court's decision here will thus bear on the SEC's ability to assert a similar theory to seek journalistic-source information.

In sum, any weighing of enforcement of the subpoena without independently considering the privacy interests in client identities, as urged by the SEC, will signal to the Commission that it may disregard third-party confidentiality obligations of the *victims* of a computer intrusion to merely "assur[e]" itself that no law has been broken.  Ney Decl. Ex. C, at 3.  That would be of great concern to professions that rely on credible confidentiality guarantees to third parties, not least of which is the news media.

## II.   Absent a stronger news media policy like that at DOJ, adopting the SEC's legal theory here could increase the potential for agency overreach.

While the SEC implemented a policy governing when it can subpoena journalists in 2006 (after being criticized for subpoenaing two reporters before backing down in the face of public criticism), that policy is weak relative to the policies of other agencies.  Rather than require SEC investigators to meet some exigency requirement, or obtain prior approval from the head of the agency before subpoenaing a journalist, the SEC's guidelines lay out a vague test for balancing "the public's interest in the free dissemination of ideas and information and the public's interest in effective enforcement of the federal securities laws."  SEC Policy Statement, *supra*.  Indeed, while it was modeled on the Justice Department's policy as it existed in 2006, the SEC's policy is notably weaker than that policy was at the time.  For instance, the DOJ policy required attorney general

approval for subpoenas seeking newsgathering material, whereas the SEC can issue a subpoena for such information with the authorization of the director of enforcement, in consultation with the general counsel and mere notice to the chair. As such, fully crediting the SEC's expansive legal theory here could signal to SEC investigators that subpoenas for the identity of journalistic sources following a newsroom network intrusion are fair game.

The history of the Justice Department's News Media Guidelines is instructive, as it illustrates how insufficient internal protections for press freedom lead to improper government intrusions into the newsgathering process, public outcry, and then additional, necessary reforms by the offending agency. Bruce D. Brown & Gabe Rottman, *A major milestone in the fight for press freedom*, CNN (Oct. 28, 2022), https://perma.cc/525Z-GB6U (noting the cycle of "government overreach, apology and reform").

The DOJ's News Media Guidelines date back to the initial wave of government subpoenas seeking to force reporters to name their sources in the late 1960s and early 1970s. Surprised by the broad public condemnation of the practice, Attorney General John Mitchell spearheaded the formulation of the guidelines both in recognition of the important role of the press in a democracy, and to dampen criticism. *See Mitchell Sets Rules Limiting Subpoenas Issued to Newsmen*, N.Y. Times (Aug. 11, 1970), https://perma.cc/TQ6W-X8MQ

("[Mitchell] characterized his move as a conciliatory step to allay the news media's fears over the growing use of subpoenas, and to 'avoid a confrontation and an imposed settlement' of the issue by the courts.").  In his speech announcing the guidelines, Mitchell acknowledged the significance of journalists' professional confidentiality obligations, and the showdown that would inevitably result if law enforcement investigations were pitted against journalists' duty to protect their confidential sources.  *See* Hon. John N. Mitchell, "Free Press and Fair Trial: The Subpoena Controversy," Address Before the House of Delegates of the American Bar Association (Aug. 10, 1970) ("Serious journalists from all the media have told me privately that they will go to prison rather than comply with subpoenas; that they will destroy their notebooks and burn their film rather than permit them to be used in a judicial proceeding.").

But the Mitchell guidelines proved insufficient.  A 1980 subpoena for the telephone toll records of the New York Times's Atlanta bureau and bureau chief Howell Raines's home phone sparked press and public outcry and further reform. *See* Robert Pear, *Justice Dept. Restricts Subpoenas for Reporters and Phone Records*, N.Y. Times (Nov. 13, 1980), https://perma.cc/YE38-UWJK.  In 2013, revelations that the Justice Department had authorized a secret dragnet subpoena for Associated Press phone records, as well as a warrant to seize the contents of a reporter's emails—both in national security leak investigations—led to significant

13

revisions to the guidelines. *Gov't obtains wide AP phone records in probe*, Associated Press (May 13, 2013), https://perma.cc/V636-N7E2; *Amending the Department of Justice subpoena guidelines*, Reporters Comm. for Freedom of the Press (accessed Feb. 17, 2023), https://www.rcfp.org/attorney-general-guidelines/. Then-Attorney General Eric Holder convened a News Media Dialogue Group with senior journalists, media lawyers, and top-level officials at the Justice Department to discuss reforms, including flipping a presumption against providing advanced notice to the affected member of the news media to a presumption in favor of advanced notice, expanding the guidelines to warrants, and requiring elements of the military and intelligence agencies to certify, for instance, the damage from media leaks before pursuing compulsory process against a member of the news media. *Id.*

And even the reforms made in 2014 and 2015 were not enough. In 2021, the DOJ notified news organizations that, in leak investigations in 2020, it had secretly sought the phone and email records of eight journalists across three major, national outlets: CNN, The New York Times, and The Washington Post. *See* Brown & Rottman, *supra.* That led Attorney General Merrick Garland, in 2021, to scrap the balancing test in the old guidelines (which remains in the SEC's policy) that directed the department to weigh its own investigative needs against the interests of the free press. Memorandum on Use of Compulsory Process to Obtain

14

Information from, or Records of, Members of the News Media, Office of the Attorney General (July 19, 2021), https://perma.cc/VSH7-84HL ("[A] balancing test may fail to properly weight the important national interest in protecting journalists from compelled disclosure of information revealing their sources, sources they need to apprise the American people of the workings of their government.").  The updated DOJ News Media Guidelines prohibit the use of compulsory process against members of the news media acting within the scope of newsgathering, except when used to authenticate already published material, when the member of the news media consents, or to prevent an imminent or concrete risk of death or serious bodily harm.  28 C.F.R. § 50.10(c) (2023).  The revised News Media Guidelines also confirm that "newsgathering" includes the receipt, possession, and publication of government information, including classified information, as well as the "process by which a member of the news media . . . pursues" the news.  28 C.F.R. § 50.10(b) (2023).  In short, the lesson of the history of reforms to the Justice Department's News Media Guidelines is that a policy like the one currently in place at the SEC leaves the door open to improper compulsory process, and that door will open wider were the Court to accept the legal theory advanced by the SEC here.[2]  Moreover, the Court's intervention in this case is

---

[2]     Notably, U.S. Immigration and Customs Enforcement ("ICE") recently had a similar experience.  Its parent agency, the Department of Homeland Security

singularly important in that internal policies of an agency, no matter how strong, are subject to change.  Put simply, there is no substitute for independent judicial review of an agency's claimed investigative authority, a gatekeeping function that the SEC argues that the Court should not perform here.  Applicant's Mem. in Supp. 6–12, ECF No. 1.  The Court should reject that claim and carefully consider the privacy interests in the confidential information sought.

Finally, adopting the SEC's legal theory here could lead to the direct circumvention of DOJ's News Media Guidelines.  That is, the SEC reserves the discretion to investigate facts and make a referral to the DOJ for criminal prosecution.  *See SEC Announces Enforcement Results for FY22*, U.S. Securities & Exchange Comm'n (Nov. 15, 2022), https://www.sec.gov/news/press-release/2022-206 ("The Enforcement Division often refers certain cases . . . to criminal authorities.  In many cases, these referrals result in parallel investigations and, ultimately, charges filed by the SEC and criminal law enforcement.").  While the News Media Guidelines would completely preclude DOJ's use of a subpoena

---

does not have an agency-wide policy regarding compulsory process to members of the news media.  But, following criticism after ICE issued a subpoena trying to force Buzzfeed News to disclose source identities, Congress directed that ICE implement such a policy.  *See* Hamed Aleaziz, *The Trump Administration is Trying to Force Buzzfeed News to Divulge its Sources With a Subpoena*, Buzzfeed News (Dec. 4, 2020), https://perma.cc/6J6H-AJM3; Gabe Rottman, *Ice Enacts New Policy Protecting Media from Legal Demands*, Lawfare (June 29, 2022), https://perma.cc/YD2F-H86Z.

to identify confidential sources in the event of a newsroom breach, the theory advanced by the SEC here would permit such compulsory process.  As such, the SEC could use a subpoena in a manner violative of the DOJ News Media Guidelines and then use the information it acquired to refer a case to the Justice Department.  Though the Department's News Media Guidelines include an anti-circumvention provision instructing members of the Department not to direct any third party, including officials within another law enforcement agency, from conducting investigations that would violate the guidelines' provisions, *see* 28 C.F.R. § 50.10(r) (2023), a subpoena originating under the SEC's civil investigative authority would not require any direction from DOJ.

These concerns are not hypothetical.  Like Covington, major US newsrooms have been subject to attempted and, in some cases, successful cyberattacks.  Sean Lyngaas, *U.S. journalists targeted by foreign hackers who show sophisticated understanding of American politics*, CNN (July 14, 2022), https://perma.cc/P9PK-H29G; Roger Yu, *Newsrooms may revisit security after AP hacking*, USA TODAY (April 23, 2012), https://perma.cc/XGP5-Y6XX.  Journalists routinely communicate with SEC-regulated entities, including confidential sources therein, and nothing, save perhaps its weak 2006 policy or political considerations given the inevitable fallout, would prevent the SEC from issuing a subpoena for the identity of those sources and then, if that subpoena survives a court challenge,

using that information as the basis for a criminal referral to the DOJ based on the fruits of its investigation.  Protections for newsgathering should not be left to the discretion of a government agency, and adopting the legal theory advanced by the SEC here would make such a scenario more plausible.

## CONCLUSION

For the foregoing reasons, the Reporters Committee urges this Court to reject the expansive legal theory advanced by the SEC.

Dated: February 21, 2023

Respectfully submitted,

*/s/ **Bruce D. Brown***
  Bruce D. Brown
  (D.C. Bar No. 457317)
   *Counsel of Record*
  Katie Townsend
  (D.C. Bar No. 1026115)
  Gabe Rottman
  (D.C. Bar No. 992728)
  The Reporters Committee for
   Freedom of the Press
  1156 15th St. NW, Suite 1020
  Washington, DC 20005
  Telephone: (202) 795-9300
  Facsimile: (202) 795-9310
  bruce.brown@rcfp.org

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the lengths permitted by LCvR 7(o)(4) because it does not exceed 25 pages.  Pursuant to LCvR 7(o)(5), this amicus brief complies with the requirements set forth in FRAP 29(a)(4).

Dated: February 21, 2023

*/s/ Bruce D. Brown*
Bruce D. Brown
*Counsel for Amici Curiae*
