## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

      Applicant,

          v.

COVINGTON & BURLING LLP,

      Respondent.

Case No. 23-mc-00002 (APM)

**_AMICUS CURIAE_ BRIEF OF ASSOCIATION OF CORPORATE COUNSEL
IN SUPPORT OF RESPONDENT'S BRIEF IN OPPOSITION**

Kwaku A. Akowuah (D.C. Bar No. 992575)
David S. Petron (D.C. Bar No. 486325)
Joshua J. Fougere (D.C. Bar No. 1000322)
Brooke B. Boyd (D.C. Bar No. 1721284)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
kakowuah@sidley.com
jfougere@sidley.com
brooke.boyd@sidley.com

Dated: February 21, 2023

_Counsel for The Association of Corporate
Counsel_

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

CORPORATE DISCLOSURE STATEMENT ............................................. v

IDENTITY AND INTEREST OF AMICUS CURIAE ................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

ARGUMENT ............................................................................................. 5

I.     THE COURT SHOULD NOT ADOPT THE COMMISSION'S
       SWEEPING VIEW OF ADMINISTRATIVE SUBPOENA POWER ................ 5

       A.     The Commission's View of Rule 1.6 Is That Administrative
              Subpoenas Provide Agencies With Carte Blanche To Obtain
              Protected Communications and Information. ......................................... 5

       B.     There Is No Reason For the Court to Adopt the Commission's
              View and Every Reason To Avoid It. ...................................................... 7

              1.     The Commission's View Is Wrong. ............................................. 7

              2.     The Commission's View Is Dangerous. ....................................... 9

              3.     The Commission's View Has No Practical Value. ..................... 11

II.    THE COURT SHOULD NOT PERMIT THE COMMISSION TO
       INTRUDE ON CLIENT SECRETS OR PROTECTED
       COMMUNICATIONS. ........................................................................ 12

       A.     The Issued Subpoena Seeks Client Secrets and Protected
              Communications. ..................................................................................... 12

              1.     Even Requesting Client Names Implicates Protected
                     Information. .............................................................................. 12

              2.     Requesting Communications with Clients Implicates
                     Attorney-Client Privilege and Work Product. ........................... 14

       B.     The Commission's Proposed Intrusion Would Be Profoundly
              Harmful to ACC and Its Members. ....................................................... 15

              1.     The Implications for ACC and Its Members Are Enormous. ...... 15

              2.     The Commission Has Not Justified Its Proposed Intrusion. ...... 16

      3.      The Court Should Find the Subpoena Unreasonable and Unduly Burdensome. ................................................................ 19

CONCLUSION ............................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Franklin,*
   924 A.2d 993 (D.C. 2007) ........................................................................ 12

*CFPB v. Accrediting Council for Indep. Colls. & Schs.,*
   854 F.3d 683 (D.C. Cir. 2017) ............................................................ 10, 19

*Demov, Morris, Levin & Shein v. Glantz,*
   53 N.Y.2d 553 (1981) ............................................................................. 3, 16

*FTC v. Trudeau,*
   No. 03 C 3904, 2013 WL 842599 (N.D. Ill. March 6, 2013) ..................... 9

*In re Grand Jury Subpoena to Att'y (Under Seal),*
   679 F. Supp. 1403 (N.D. W. Va. 1988) ................................................... 10

*In re Hager,*
   812 A.2d 904 (D.C. 2002) ........................................................................ 13

*In re Motion to Compel Compliance with Subpoena Directed to Cooke
   Legal Grp., PLLC,*
   333 F.R.D. 291 (D.D.C. 2019) ................................................................... 9

*Okla. Press Publ'g Co. v. Walling,*
   327 U.S. 186 (1946) ................................................................................. 12

*In re Pub. Def. Serv.,*
   831 A.2d 890 (D.C. 2003) ..................................................................... 4, 10

*SEC v. Brigadoon Scotch Distrib. Co.,*
   480 F.2d 1047 (2d Cir. 1973) .................................................................. 10

*SEC v. Jerry T. O'Brien, Inc.,*
   467 U.S. 735 (1984) ................................................................................... 8

*SEC v. Sassano,*
   274 F.R.D. 495 (S.D.N.Y. 2011) ............................................................... 9

*Selevan v. SEC,*
   482 F. Supp. 3d 90 (S.D.N.Y. 2020) ......................................................... 9

*Stockton v. Ford,*
  52 U.S. 232 (1850) ........................................................................... 14

*United States v. Legal Servs. for N.Y.C.,*
  249 F.3d 1077 (D.C. Cir. 2001)........................................................ 9, 19

*United States v. Monnat,*
  853 F. Supp. 1301 (D. Kan. 1994) ....................................................... 11

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) ............................................................................ 8

## Scholarly Authorities

John W. Bagby, *Administrative Investigations: Preserving a
  Reasonable Balance between Agency Powers and Target Rights,* 23
  Am. Bus. L.J. 319 (1985) ..................................................................... 8

Vincent S. Walkowiak, *The Attorney-Client Privilege in Civil
  Litigation, Chapter 1: An Overview of the Attorney-Client Privilege
  When the Client Is a Corporation* (Vincent S. Walkowiak & Oscar
  Rey Rodriguez eds., 7th ed. 2019) ...................................................... 15

## Other Authorities

D.C. Bar, Ethics Op. No. 214 (Sept. 18, 1990) ................................... 8, 11, 13

D.C. Bar, Rules of Professional Conduct, Rule 1.6, cmt. 28....................... 11

Dep't of Justice Manual § 9-13.410 .............................................. 18

Commissioner Hester Peirce, *Dissenting Statement on Cybersecurity
  Risk Management, Strategy, Governance, and Incident Disclosure*
  (Mar. 9, 2022), https://www.sec.gov/news/statement/peirce-
  statement-cybersecurity-030922................................................................ 2

SEC, *Commission Statement and Guidance on Public Company
  Cybersecurity Disclosures* (Feb. 21, 2018),
  https://www.sec.gov/rules/interp/2018/33-10459.pdf ............................... 3

SEC, *Proposed Rule: Cybersecurity Risk Management, Strategy,
  Governance, and Incident Disclosure* (Mar. 9, 2022),
  https://www.sec.gov/rules/proposed/2022/33-11038.pdf........................... 3

Office of Legal Policy, U.S. Dep't of Justice, Report to Congress on the
  Use of Administrative Subpoena Authorities by Executive Branch
  Agencies and Entities (2002) .................................................................. 6

## <u>CORPORATE DISCLOSURE STATEMENT</u>

I, the undersigned counsel of record for Association of Corporate Counsel, certify that to the best of my knowledge and belief, there are no parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of Association of Corporate Counsel which have any outstanding securities in the hands of the public.

These representations are made in order that judges of this Court may determine the need for recusal.

Attorney of Record for Association of Corporate Counsel

/s/ Kwaku A. Akowuah

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*Amicus Curiae* Association of Corporate Counsel ("ACC") is the leading global bar association that promotes the common professional and business interests of in-house counsel.  ACC has over 40,000 members who are in-house lawyers employed by over 10,000 corporations, associations, and other organizations in more than 80 countries.  Founded as the American Corporate Counsel Association in 1981, ACC has grown from a small organization of in-house counsel to a worldwide network of legal professionals, focused on delivering a mix of relevant and timely services, including information, education, networking opportunities, and advocacy.  ACC has long sought to aid courts, legislatures, regulators, and other law or policy-making bodies in understanding the role and concerns of in-house counsel and is a frequent amicus participant in important cases affecting in-house counsel.

This is one of those cases.  The Securities and Exchange Commission's view of its administrative subpoena authority would vitiate critical protections for client secrets and confidences under Rule 1.6 of the D.C. Rules of Professional Conduct and would seriously degrade the attorney-client privilege.  Those protections are integral to maintaining the lifeblood of the legal profession—unflagging attorney-client trust. ACC is uniquely interested in this case because its members function both as

---

[1] Pursuant to Local Civil Rule 7(o)(5) and consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), ACC states that no counsel for any party authored this brief in whole or in part; no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus curiae*, its members, or its counsel made such a monetary contribution. Pursuant to Local Civil Rule 7(o)(1), the Court agreed to accept *amicus curiae* briefs without an accompanying motion for leave to file.

1

attorneys and clients.  They are lawyers who rely on such protections when providing advice and counsel to their internal business clients, and they rely on the same protections from the client side when they engage outside law firms.  A ruling that the Commission's administrative subpoena power creates broad and unbounded exceptions to longstanding attorney-client safeguards would risk acute and ongoing intrusions into critical interests of ACC and its members.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Make no mistake:  the Commission's view of its administrative subpoena power implicates much more than the made-for-litigation narrowing that the Commission has sued to enforce.

The Commission starts from a point of dubious investigative interest.  It seeks to justify its invasive subpoena by emphasizing the "significance and importance" of cybersecurity issues.  Mem. 5.  But, although the Commission has legitimate cybersecurity responsibilities, the Commission is *not* a cybersecurity regulator.[2] Instead, when it comes to cybersecurity, the Commission has an ancillary role, which, as to public companies, is predominantly related to disclosures.  It seeks to protect market integrity against the prospect of insider trading enabled by security breaches, and to ensure that investors receive material information related to public companies'

---

[2] *See* Commissioner Hester Peirce, *Dissenting Statement on Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure* (Mar. 9, 2022), https://www.sec.gov/news/statement/peirce-statement-cybersecurity-030922 ("We have an important role to play in ensuring that investors get the information they need to understand issuers' cybersecurity risks if they are material. This proposal, however, flirts with casting us as the nation's cybersecurity command center, a role Congress did not give us.").

cybersecurity risks and incidents.[3]  The Commission's stated reasons for pursuing that ancillary interest through the subpoena to Covington are speculative.  The Commission claims that, if it could compel the disclosure of Covington's client list, it could use that information to more easily search for trading irregularities and disclosure violations.  But the Commission specifies no suspicion of any irregularities or violations of law.   By appearances, the Commission merely intends to use Covington's files as an investigative shortcut to fish around.  *See id.* at 3.

Against that limited investigative interest, the Commission's subpoena pits another, more significant one—the long-acknowledged "significance and importance" of uncompromising trust between attorneys and their clients.  It has been aptly said that "[t]he unique relationship between an attorney and client, founded in principle upon the elements of trust and confidence on the part of the client and of undivided loyalty and devotion on the part of the attorney, remains one of the most sensitive and confidential relationships in our society."  *Demov, Morris, Levin & Shein v. Glantz,* 53 N.Y.2d 553, 556 (1981).  To protect that relationship, bar rules command lawyers to shield confidences and secrets, even to the point of requiring lawyers to litigate in the face of non-consensual efforts to breach the shield.  Lawyers and clients, in turn, count on the courts to help protect the values enshrined in those rules.

---

[3] SEC, *Commission Statement and Guidance on Public Company Cybersecurity Disclosures* (Feb. 21, 2018), https://www.sec.gov/rules/interp/2018/33-10459.pdf ("SEC Guidance") ("although no existing disclosure requirement explicitly refers to cybersecurity risks and cyber incidents, companies nonetheless may be obligated to disclose such risks and incidents").  *See also* SEC, *Proposed Rule: Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure* (Mar. 9, 2022), https://www.sec.gov/rules/proposed/2022/33-11038.pdf.

Indeed, although in certain circumstances a "subpoena to an attorney may be perfectly proper, the fundamental interests at stake necessitate careful judicial scrutiny." *In re Pub. Def. Serv.*, 831 A.2d 890, 900 (D.C. 2003).

The Commission's position clashes directly with the understanding that careful judicial scrutiny is essential when a subpoena is served on a lawyer. The Commission's position is that it always wins, so long as the agency can identify an investigative purpose—however speculative—for its interest in peering into the lawyer's files. In advancing that view, the Commission seriously minimizes the importance of the bar and ethical rules. That is a startling proposition, especially in light of the dizzying number of agencies that hold administrative subpoena power. It also accentuates the stakes here. The Commission's theory of its actual power—and the power of many other agencies—is much broader than the request on which it has sued. If the Commission's first-of-its-kind theory prevailed, there is every reason to expect that the number of agency subpoenas directed to lawyers and law firms would quickly multiply.

Even as limited, however, the Commission's subpoena poses significant threats to lawyers and the clients who trust them to guard secrets and confidences. If the Commission prevails, Covington will be forced to hand over a list of nearly 300 clients to a regulator that openly plans to target the clients for investigation. Not only that, but the Commission's investigation is bound to invade attorney-client confidences even if it starts with client names: deciding whether clients have violated disclosure laws is almost certainly going to require an inquiry in *what* client information was

breached, because there is no other conceivable way to determine whether the breach was "material" to a particular company.   Although no one ever wants to find themselves in the Commission's crosshairs, it is especially jarring to think that hundreds of clients may end up in those crosshairs by way of the lawyers from whom confidential counsel was sought.   The Commission is not at liberty to demand such betrayals, on no basis of suspicion, with no assertion of wrongdoing by any clients, purely on its own authority.   The Court should reject the Commission's overreach.

## ARGUMENT

## I.   THE COURT SHOULD NOT ADOPT THE COMMISSION'S SWEEPING VIEW OF ADMINISTRATIVE SUBPOENA POWER.

Rule 1.6 of the D.C. Rules of Professional Conduct has two provisions at issue here:  subsection (a)(1) forbids attorneys from "knowingly … reveal[ing] a confidence or secret of the lawyer's client," and subsection (e)(2)(a) provides an exception, which allows disclosure when "required by law or court order."   The Commission argues that, for administrative subpoenas, the "exception" in subsection (e) swallows entirely the protections in subsection (a).   The Court need not and should not adopt that contention.

### A.   The Commission's View of Rule 1.6 Is That Administrative Subpoenas Provide Agencies With Carte Blanche To Obtain Protected Communications and Information.

The Commission claims that what is at issue here is a "very narrow" and "extremely limited" subpoena.   Mem. 12, 14.   The basis for those qualifiers is the Commission's decision—for the time being—to litigate "only" its request for client names.   But the Commission elsewhere acknowledges that its narrowed request was

merely a "negotiation" tactic designed to "avoid the need for this subpoena enforcement action," and that the Commission stands behind the supposedly "lawful" scope of its original (and broader) subpoena. *Id.* at 5.

These statements show that there is nothing "very narrow" or "extremely limited" about the Commission's actual view of its administrative subpoena power or the legal theory it asks the Court to endorse. To the contrary, the Commission's position is unequivocal: "if issued a subpoena, the recipient *must comply* notwithstanding Rule 1.6, absent some other valid objection." *Id.* at 13 (emphasis added); *see also* Ney Decl., Ex. C (SEC Ltr. to Covington) at 4 ("even absent [client] consent, … Covington's continued objection based on the confidentiality prong of Rule 1.6(a) is unlikely to protect the information from disclosure"). Anything goes, so long as the Commission "in its discretion" deems the investigation "proper." Mem. 7-8.

Consider what that means from a practical perspective. More than 20 years ago, a DOJ study "identified approximately 335 existing administrative subpoena authorities held by various executive branch entities under current law." Office of Legal Policy, U.S. Dep't of Justice, Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities, 5 (2002). What is more, "[m]ost administrative subpoena authorities have been redelegated by the entity head to subordinate officials within the entity," and sometimes "the decision to issue a subpoena is made unilaterally by an agency official." *Id.* at 7. Under the Commission's theory, every single one of these agencies and unchecked officials would be able to breach attorney-client protections based on nothing more than the fact that

the subpoenaing investigators want to force the lawyer to hand over client secrets. *See* Mem. 9 (arguing that the scope of subpoena power is "for the investigators to determine"). After that, lawyers simply "must comply." *Id.* at 13.

That is an alarming prospect for ACC and its members. Corporations are often regulated by many different agencies. If the Court were to adopt the Commission's view of the world, the sprawl of subpoenas implicating protected information would be vast. Between subpoenas to corporate counsel and subpoenas to law firms from whom corporate counsel seek advice, ACC's members could easily face a barrage of subpoenas from all sides.

### B. There Is No Reason For the Court to Adopt the Commission's View and Every Reason To Avoid It.

There is no dispute that an order from this Court would be a "court order" under Rule 1.6(e) that would compel disclosure. That is what Covington told the Commission in a white paper that the Commission requested. *See* Ney Dec., Ex. B, at 1 (stating that disclosure is not allowed "absent informed client consent *or a court order*…") (emphasis added). Now that the case is *in court*, therefore, there is no reason for the Commission to reach out and ask the Court to decide whether an administrative subpoena independently qualifies as a "law or court order." The Commission's invitation to do so is wrong, dangerous, and has no practical value.

#### 1. The Commission's View Is Wrong.

To qualify under the Rule 1.6(e)(2)(a) exemption, the protected information must be required by a law or a court order. An administrative subpoena is neither.

As a matter of plain language, an administrative subpoena from an agency cannot be a "court order" when no court is involved.  Indeed, an agency "has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function."  *United States v. Morton Salt Co.,* 338 U.S. 632, 642 (1950); *see also* John W. Bagby, *Administrative Investigations: Preserving a Reasonable Balance between Agency Powers and Target Rights,* 23 Am. Bus. L.J. 319, 319-20 (1985) ("There are significant differences between the subpoena powers of the court system and those of the federal administrative agencies.").

Nor are administrative subpoenas "laws."  A subpoena may issue *pursuant to* an authority granted by statute or law, but that does not make the subpoena *itself* a "law."  Unlike laws, "[s]ubpoenas issued by the Commission are not self-enforcing." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984).  By contrast, a disclosure statute could be a "law" that satisfies section 1.6(e), when the statute is "narrowly and specifically drawn" and "[c]ivil and criminal penalties are available to enforce its provisions."  D.C. Bar, Ethics Op. No. 214 (Sept. 18, 1990).[4]  None of those attributes inhere in an administrative subpoena from the Commission.

The Commission's cited authorities (Mem. 13-14) do not say otherwise.  The Commission relies on four cases, none of which are binding, much less persuasive. The only one that involves an SEC administrative subpoena is clearly distinguishable

---

[4] Even still, in that case, the D.C. Bar ultimately concluded that, because "substantial good faith arguments exist[ed]" regarding "whether Congress intended the statute to override traditional lawyer-client confidentiality," it was "clear that a firm may not ethically disclose the name of its client" even in response to the IRS administrative summons.  D.C. Bar, Ethics Op. No. 214.

because it did not involve a subpoena directed at an attorney and thus did not implicate the ethics rules that govern the practice of law or the unique and compelling confidentiality interests that those ethics rules reflect. *Selevan v. SEC*, 482 F. Supp. 3d 90 (S.D.N.Y. 2020) (SEC subpoena to a bank).

As Covington points out, the remaining three cases address Rule 45 subpoenas, and those are not analogous. Covington Br. 17-18. For example, there are procedural safeguards in a court setting that are not present for an administrative subpoena. *Id.* In addition, "[a]dministrative subpoenas are horses of a slightly different color, since upon noncompliance the issuing agency seeks enforcement in the district court," whereas civil subpoenas are litigated in contempt proceedings following noncompliance. *United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1081 (D.C. Cir. 2001). In all events, the cases relied upon by the Commission do not fully explain the bases of their conclusions or are simply inapposite. *See In re Motion to Compel Compliance with Subpoena Directed to Cooke Legal Grp., PLLC*, 333 F.R.D. 291, 296 (D.D.C. 2019) (containing one conclusory sentence and failing to explain whether the court even considered the subpoena a law or court order); *FTC v. Trudeau*, No. 03 C 3904, 2013 WL 842599, at *4 (N.D. Ill. March 6, 2013) (noting that, consistent with Covington's position, the attorneys fulfilled their ethical obligations "by bringing the matter to this court's attention and must, *if ordered*, reveal the information" (emphasis added)); *SEC v. Sassano*, 274 F.R.D. 495 (S.D.N.Y. 2011) (applying N.Y. Rule 1.6, which has been construed to be less protective than D.C.'s rule).

## 2.   The Commission's View Is Dangerous.

Precisely because the Commission's view of its own subpoena power is unbounded, the existence and scrutiny of judicial oversight are critical.  In garden variety subpoena enforcement cases, the judiciary's normal and deferential review makes plenty of sense.  Even then, the "deference courts afford agencies does not eviscerate the independent role which the federal courts play in subpoena enforcement proceedings" and that role "is neither minor nor ministerial."  *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017) (cleaned up).

What is happening here, however, is unprecedented—not garden variety—and the Court's scrutiny should ratchet up accordingly.  As the D.C. Court of Appeals has explained, "the fundamental interests at stake" with a "subpoena to an attorney" "necessitate careful judicial scrutiny."  *Pub. Def.*, 831 A.2d at 900.  Indeed, "the mere issuance of the subpoena may undermine the integrity of the attorney-client relationship."  *In re Grand Jury Subpoena to Att'y (Under Seal)*, 679 F. Supp. 1403, 1411 (N.D. W. Va. 1988).  Those heightened interests warrant heightened protection.

The Commission's own cases recognize the significance of judicial oversight. In *SEC v. Brigadoon Scotch Distribution Co.*, for example, the court admonished that the Commission "is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its *effects*."  480 F.2d 1047, 1056 (2d Cir. 1973) (emphasis added).

Those effects are substantial here.  The Commission does not veil its plans for the information it seeks.  The Commission intends to investigate Covington's clients

for wrongdoing—despite lacking any particular reason to suspect that these clients did anything wrong.  *See* Mem. 8 ("the Commission has a legitimate interest in knowing whether [Covington's clients] made all required disclosures").  In other words, simply because the clients sought legal advice from Covington, the Commission wants to investigate them—and maybe even pursue enforcement.  When a "lawyer's compliance" with a subpoena "may submit the client to an investigative process at the hands of the United States," then the lawyer's compliance has come "at quite a price."  *United States v. Monnat*, 853 F. Supp. 1301, 1304 (D. Kan. 1994).

### 3.   The Commission's View Has No Practical Value.

The final reason for declining to hold that an administrative subpoena is a law or court order is a practical one:  it would not change lawyers' ethical obligations but may chill attorney behavior.

Rule 1.6 requires that attorneys "not comply" with a disclosure request until the lawyer has personally made "every reasonable effort to appeal the order or has notified the client of the order and given the client the opportunity to challenge it." D.C. Bar, Rules of Professional Conduct, Rule 1.6, cmt. 28.  After receiving an agency subpoena, firms remain under "an ethical obligation to resist disclosure until either the consent of the client is obtained or the firm has exhausted available avenues of appeal with respect to the summons."  D.C. Bar, Ethics Op. No. 214.  Given these exhaust-all-avenues obligations, if this exact situation were to happen again tomorrow, ethical rules would put the parties right back in court.

The Commission would nevertheless gain an intimidation tool.  It is no surprise that "[m]any persons have yielded [to an administrative subpoena] solely

because of the air of authority with which the demand is made." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 219 (1946) (Murphy, J. dissenting).  A decision adopting the Commission's view—that a subpoena is independently sufficient to require disclosure of protected information—could therefore allow the agency to intimidate lawyers and, at a minimum, force them to litigate in the face of agency attempts to force breaches of their ethical duties to their clients.  The Court should not provide the Commission any more leverage than it already has.

## II.   THE COURT SHOULD NOT PERMIT THE COMMISSION TO INTRUDE ON CLIENT SECRETS OR PROTECTED COMMUNICATIONS.

### A.   The Issued Subpoena Seeks Client Secrets and Protected Communications.

The subpoena that the Commission sent to Covington sought names of Covington clients and communications between Covington and those clients.  *See* Ney Decl, Ex. A, at 5-6.  Both categories are protected.

#### 1.   Even Requesting Client Names Implicates Protected Information.

Although "privilege" is of course crucial, a "lawyer's ethical duty to preserve a client's confidences and secrets is broader than the attorney-client privilege." *Adams v. Franklin*, 924 A.2d 993, 997 (D.C. 2007).  Under Rule 1.6, secrets are defined broadly to include "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client." *Id.* at 996.

The Commission demands the disclosure of nearly 300 clients' identities, each of which is protected as a secret (if not also a confidence).[5]  "Disclosure of a client's identity falls within the scope of Rule 1.6(a)(1)."  *In re Hager*, 812 A.2d 904, 920 (D.C. 2002); *see also* D.C. Bar, Ethics Op. No. 214 (protecting "the confidentiality of client names").  Particularly when the Commission has openly declared an intent to *investigate the clients*, disclosure of their names would certainly be "embarrassing, or would be likely to be detrimental, to the client."  *See* D.C. Bar, Ethics Op. No. 214 n.1 (listing a potential government prosecution as an example of what could "embarrass or detrimentally affect" a client).  Worse, the Commission has provided no basis for fishing through the clients' disclosures and subjecting them to the burden of an SEC investigation.  The only "reason" the Commission has articulated is the simple fact that the clients were indirect victims in the hack of Covington's systems; the Commission nowhere suggests any suspicion that the clients were in any way at fault for the cybersecurity breach, that the breach was material to them, or that any of them failed to make required disclosures.  Mem. 8, 10.

The Commission's attempted opportunistic intrusion into client secrets is particularly unnerving for ACC and its members.  As corporations, as clients of law firms, or both, ACC's members are often potential targets of cyberattacks and cybercriminals.  Whatever broad latitude that the Commission has to fish in investigations with no articulation of wrongdoing, that latitude should not extend to conscripting the companies' lawyers into the expedition.

---

[5] *See* Covington Br. 19-20.

## 2.   Requesting Communications with Clients Implicates Attorney-Client Privilege and Work Product.

Rule 1.6(b) defines "confidence" as "information protected by the attorney-client privilege under applicable law."  It is hard to overstate the importance of these protections.  In the Supreme Court's words, "[t]here are few of the business relations of life involving a higher trust and confidence than that of attorney and client … few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it."  *Stockton v. Ford*, 52 U.S. 232, 247 (1850).

The Commission's original demand sought privileged communications between Covington and its clients.  Ney Decl, Ex. A, at 5-6; *see* Ney Decl, Ex. B, at 7-10 (Covington explaining how the request covered privileged information).  Although the Commission has strategically winnowed its original demands for court, there is no reason to expect its intrusion into the attorney-client relationship to stop there.  The Commission says that it plans to investigate whether any of the client-victims failed to disclose the attack in their public filings. Mem. 8, 10.  To make that determination, the Commission will likely need more protected information from the clients regarding the nature and contents of their communications with their attorneys at Covington.  *See* Covington Br. 10.  The Commission's disclosure rules apply to cybersecurity incidents that are *material* to publicly-traded companies—an inquiry that is surely going to probe deeper into documents that are fully protected by the

14

attorney-client privilege.  How else could the Commission assess questions like, in its words, "the importance of any compromised information and of the impact of the incident on the company's operations"?  SEC Guidance, at 10-11.  In short, the Commission unquestionably views its subpoena power as extending beyond secrets to privileged materials and confidences.

## B.   The Commission's Proposed Intrusion Would Be Profoundly Harmful to ACC and Its Members

The Commission offers no limiting principle on its ability to intrude into the sacrosanct areas of attorney-client secrets and confidences.  That is a serious red flag to which the Court should be attuned in deciding the balance of interests.

### 1.   The Implications for ACC and Its Members Are Enormous.

ACC's members would feel the sting of a decision ruling for the Commission on multiple fronts.  Corporations rely on the trust and confidence of the attorney-client relationship with their own lawyers and their outside lawyers.[6]  In that way, in-house counsel functions in essence as both lawyer and client—often at the same time.  That makes them doubly exposed to the Commission's proposed degradation of attorney-client confidences and secrets.

Members in highly-regulated industries face the additional concern that the Commission's conduct here might "inspire" copycat subpoenas.  The possibilities are

---

[6] Vincent S. Walkowiak, *The Attorney-Client Privilege in Civil Litigation, Chapter 1: An Overview of the Attorney-Client Privilege When the Client Is a Corporation* 5 (Vincent S. Walkowiak & Oscar Rey Rodriguez eds., 7th ed. 2019) ("The free flow of uncensored information between an attorney and client is as important within a corporation as it is between the corporation and outside counsel.").

endless.  Take an example close to this case—a corporation that is the victim of a cyberattack.  The attack is asserted to trigger SEC disclosure obligations, the extent of which are not clearly settled.  A corporate counsel would normally seek the opinion of an outside attorney who specializes in SEC matters, but she decides to forgo counseling on the matter because she fears that mere engagement with a known SEC expert may subject her employer to SEC scrutiny—the Commission could subpoena the expert's client list.  Or, if corporate counsel does engage with an outside attorney, she may be reluctant to share all details of the attack for fear that outside counsel will be forced to turn the corporation's information over to the agency, which has made clear that it does not view Rule 1.6 as an impediment to the grasp of its administrative subpoenas, even with respect to privileged materials.

Members may change their behavior prospectively too.  The looming threat of administrative subpoenas could lead to institutionalized practices that degrade the quality of legal advice their corporate counsel can provide.  For example, a corporation may attempt to reduce its paper trail when consulting with its in-house counsel by insisting that employees communicate information to counsel regarding regulated events (like cyberbreaches) primarily by phone and without written records.

None of this is how "one of the most sensitive and confidential relationships in our society," *Glantz,* 53 N.Y.2d at 556, is supposed to work.

## 2. The Commission Has Not Justified Its Proposed Intrusion.

The Commission purports to justify its subpoena based on the claims that (1) "[t]he significance and importance of cybersecurity issues to the Commission's

mission has never been more apparent," Mem. 5, and (2) the information can only be procured through a subpoena, Mem. 8, 10.  Both propositions fail.

First, the Commission's appeal to broad notions of cybersecurity cannot support its far-reaching position.  Again, the Commission is not directly investigating any cybersecurity issue—it lacks authority to do that—and its interests are steps removed from cybersecurity itself.  The Commission wants to know whether SEC registrants were the clients of a law firm that was the victim of a cybersecurity incident.  Although being the client of a victimized law firm is not a violation of anything, the Commission's interests are yet another step removed.  More specifically, the Commission wants to know whether registrants (the clients) complied with Commission rules concerning disclosure of someone else's cybersecurity incident and, perhaps, whether Covington clients were additionally victimized through illicit trading.  Although cybersecurity issues may be important, fishing expeditions to see if unknown companies may have been indirect victims of a cybersecurity attack are far less so.

Second, the Commission makes no actual showing to support its repeated assertions that the information is "solely" in Covington's possession and in "no way … obtain[able] other than by Subpoena to Covington."  Mem. 8, 10.  Particularly in light of the interests at stake, the Commission could have—and should have—made efforts to avoid or blunt its anticipated intrusion.

For one thing, there are many alternatives that the Commission could have pursued for the information.  The Commission does not mention any of them, much

less articulate whether and how it has pursued all other avenues without success. As other agencies (like DOJ) understand, a subpoena to lawyers should be the last resort, not the first. *See* Dep't of Justice Manual § 9-13.410 (requiring "all reasonable attempts" to obtain the information from "alternative sources" before subpoenaing attorneys). The Commission's proposed shortcut would make attorneys the first resort, irrespective of the sensitivities inherent in the attorney-client privilege.

For another thing, even if the Commission *had* pursued all options and come up short, there were other ways to blunt the subpoena's detrimental effects. What makes a lawyer's disclosure of client names most "likely to be detrimental" is the Commission's explicit desire to pursue agency investigation and enforcement *against those clients*. But the Commission could eliminate or substantially decrease that "detrimental" risk—and thereby mitigate at least some of the indignity to the attorney-client relationship—by agreeing not to bring enforcement actions against any of the named clients. That would leave the Commission free to pursue at least the first two of its three identified objectives—namely, "us[ing] its investigatory tools to identify any suspicious trading in those companies' securities, and investigate whether such trading was part of an illegal trading scheme based on MNPI viewed or exfiltrated as part of the Cyberattack," and "investigat[ing] whether illegal insider trading occurred." Mem. 8, 10; *see also* Mem. 3 (listing four reasons, three of which would be readily met).

Because the Commission has not even attempted to make any showing on these points, it has not justified its professed need to come into court to enforce a

18

"cybersecurity" subpoena directed at the outside lawyers who represent the clients whom the Commission seeks to investigate.

### 3.   The Court Should Find the Subpoena Unreasonable and Unduly Burdensome.

Courts must ensure that "subpoenas are not unduly burdensome or unreasonably broad." *CFPB*, 854 F.3d at 689 (cleaned up). That "burden" can extend to "the harm that disclosure of client secrets will do to [lawyers'] ability to assure clients of the secrecy of their communications." *Legal Servs. for N.Y.C.*, 249 F.3d at 1084. "[S]ubpoenas might be relevant but still unduly burdensome." *Id.*

Here, forcing Covington to serve up nearly three hundred of its clients for investigation is a tremendous burden. For a law firm, handing over innocent clients to a regulator for investigation is more than an unpleasantry; it undermines the foundation of the firm's entire enterprise. Law firms depend on their ability to garner and maintain the trust of clients. The very last thing that a client would expect a law firm to do with client secrets is turn them over to an adversary. Yet the Commission ominously but candidly reports that it has "previously brought cases against . . . companies that failed to disclose the material impact of cyberattacks to investors." Mem. 3.

The burden to Covington's clients is particularly "undue," because the Commission does not offer a hint of suspicion of wrongdoing. Not even the clients' cybersecurity protocols are at issue because it was Covington's system that suffered the breach. Nevertheless, the Commission asks this Court to force Covington to hand over its clients as a list of names from which the Commission can fish. *See* Mem. 3

(noting that the Commission seeks its information to "determine relevant disclosure obligations" of Covington's clients).

The Commission's no-suspicion-necessary stance highlights the boundless nature of its theory.  If seeking counsel from a law firm that had a security breach (over which no client had any control) is enough to put three hundred corporations in the Commission's investigatory crosshairs, ACC and its members are left to wonder: who's next?

## CONCLUSION

The Court should deny the Commission's application for an order compelling compliance with the subpoena.

Dated:  February 21, 2023                    Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
David S. Petron (D.C. Bar No. 486325)
Joshua J. Fougere (D.C. Bar No. 1000322)
Brooke B. Boyd (D.C. Bar No. 1721284)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
kakowuah@sidley.com
jfougere@sidley.com
brooke.boyd@sidley.com

*Counsel for Association of Corporate Counsel*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the requirements of Local Rule 7(o)(4) and Federal Rule of Appellate Procedure 29(a)(4), because it is less than 25 pages and uses 12-point Century Schoolbook font.

Dated:  February 21, 2023                    <u>/s/</u> Kwaku A. Akowuah

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing will be served this 21st day of February, 2023, electronically through the Court's CM/ECF system on all registered counsel.

/s/ Kwaku A. Akowuah