# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

        Applicant,

   v.

COVINGTON & BURLING LLP,

        Respondent.

Case No. 23-mc-00002 (APM)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR ORDER
COMPELLING COMPLIANCE WITH INVESTIGATIVE SUBPOENA**

Eugene N. Hansen (DC Bar ID 483638)
Lory C. Stone (DC Bar ID: 498400)
Securities and Exchange Commission
100 F. Street N.E.
Washington, D.C. 20549
Tel. 202.551.6091
Email: hansene@sec.gov

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

ARGUMENT.....................................................................................................................4

I.     COVINGTON HAS FAILED TO ESTABLISH ANY PRIVILEGE ...........................4

II.    THE COURT SHOULD APPLY THE LONG-SETTLED
STANDARD FOR ENFORCING ADMINISTRATIVE SUBPOENAS...................7

      A.    Under Controlling Precedent, Administrative Subpoenas Satisfy
The Fourth Amendment If The Agency Has Authority To Issue
The Subpoena And The Requests Are "Not Too Indefinite" And
"Reasonably Relevant" ........................................................................7

      B.    The D.C. Circuit Applies *Oklahoma Press* And *Morton Salt* To
Administrative Subpoenas Seeking "Private" Information,
Including Subpoenas to Law Firms...................................................10

      C.    *Carpenter* Does Not Apply Here ......................................................11

           1.    The Facts In *Carpenter* Differ Significantly From The
Facts In This Proceeding......................................................12

           2.    *Carpenter* Is Limited To The "Narrow" Context In
Which The Government Obtains Cell Phone Locational
Information Without A Warrant.............................................13

           3.    Extending *Carpenter* Would Upend The SEC's Ability
To Investigate Violations Of The Federal Securities Laws ...............14

      D.    Covington's Request For An Undefined Balancing Test
Has No Merit .....................................................................................16

III.   THE COURT SHOULD COMPEL COVINGTON'S COMPLIANCE
WITH THE SEC'S INVESTIGATIVE SUBPOENA.................................17

IV.   THE POLICY ARGUMENTS ADVANCED BY COVINGTON
AND AMICI LACK MERIT.......................................................20

      A.    The SEC Has Law Enforcement Interests Distinct From The
Department Of Justice And FBI And Pursues Its Investigations
Independently Of Criminal Law Enforcement Authorities.............................20

B.     The SEC Is Fulfilling Its Congressionally Mandated Mission
       Of Protecting Investors And Regulating Market Participants........................22

C.     The Present Subpoena Enforcement Action Has Limited
       Implications Outside The Specific Factual Context Of This Matter..............23

D.     The SEC Has No Other Means To Obtain The Names Of Public
       Companies Impacted By The Cyberattack Against Covington,
       Contrary To The Statements Of Covington And Amici.................................24

E.     The SEC's Investigation Is Non-Public And Confidential............................25

CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

<u>Cases</u>

*Adair v. Rose Law Firm*,
    867 F. Supp. 1111 (D.D.C. 1994) ........................................................................ 4, 11, 19

*Barback v. Fisher*,
    No. 20-515, 2022 WL 965914 (M.D. La. March 30, 2022) ............................................ 18

*Camara v. Municipal Court of San Francisco*,
    387 U.S. 523 (1967) ...................................................................................................... 16, 17

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) .................................................................................................. *passim*

*Cause of Action Inst. v. U.S. Dep't of Just.*,
    330 F. Supp. 3d 336 (D.D.C. 2018) ...................................................................................... 5

*CFTC v. Ekasala*,
    62 F. Supp. 3d 88 (D.D.C. 2014) ......................................................................................... 9

*CFTC v. First State Depository Co., LLC*,
    No. 21-mc-048 (JEB/GMH), 2021 WL 7448016 (D.D.C. June 23, 2021) ....................... 9

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ................................................................................................. 8, 9, 13

*Delaware v. Prouse*,
    440 U.S. 648 (1979) ........................................................................................................... 17

*Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*,
    124 F.3d 1304 (D.C. Cir. 1997) ......................................................................................... 11

*Donovan v. Lone Steer, Inc.*,
    464 U.S. 408 (1984) ............................................................................................................. 9

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
    180 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................................ 6

*FTC v. Church & Dwight Co., Inc.*,
    665 F.3d 1312 (D.C. Cir. 2011) ........................................................................................... 9

*FTC v. Invention Submission Corp.*,
    965 F.2d 1086 (D.C. Cir. 1992) ........................................................................................... 9

*FTC v. Platinum Plus Printing, LLC*,
    No. 21-92 (RDM), 2021 WL 3363416 (D.D.C. Aug. 3, 2021) ........................................... 9

*FTC v. Texaco, Inc.*
    555 F.2d 862 (D.C. Cir. 1977) ......................................................................... 18

*FTC v. Trudeau,*
    No. 03 C 3904, 2013 WL 842599 (N.D. Ill. Mar. 6, 2013) .............................. 18

*Hart v. Massanari,*
    266 F.3d 1155 (9th Cir. 2001) ........................................................................ 14

*In re Lindsey,*
    158 F.3d 1263 (D.C. Cir. 1998) ......................................................................... 5

*In re McVane,*
    44 F.3d 1127 (2d Cir. 1995)............................................................................. 10

*In re Sealed Case (Administrative Subpoena),*
    42 F.3d 1412 (D.C. Cir. 1994) ......................................................................... 10

*In re Subpoena Duces Tecum,*
    228 F.3d 341 (4th Cir. 2000) .................................................................. 13, 15-16

*In re Veiga,*
    746 F. Supp. 2d 27 (D.D.C. 2010) ..................................................................... 7

*Kleiser v. Chavez,*
    55 F.4th 782 (9th Cir. 2022) ........................................................................... 14

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,*
    5 F.3d 1508 (D.C. Cir. 1993)..................................................................... 11, 19

*Maryland v. King,*
    569 U.S. 435 (2013)......................................................................................... 17

*Oklahoma Press Publishing Co. v. Walling,*
    327 U.S. 186 (1946)................................................................................ *passim*

*Penfield Co. v. SEC,*
    330 U.S. 585 (1947)........................................................................................... 9

*RTC v. Walde,*
    18 F.3d 943 (D.C. Cir. 1994) ..................................................................... 10, 13

*SEC v. Arthur Young & Co.,*
    584 F.2d 1018 (D.C. Cir. 1978).................................................................. 3, 6, 15, 20

*SEC v. Whittemore,*
    No. 05-869 (RMC), 2006 WL 8462457 (D.D.C. Oct. 24, 2006).................... 4-5

*See v. City of Seattle*,
    387 U.S. 541 (1967) ............................................................................................. 9

*Taylor Lohmeyer Law Firm P.L.L.C. v. United States*,
    957 F.3d 505 (5th Cir. 2020) ............................................................................... 6

*United States v. Cal. Rural Legal Assistance, Inc.*
    824 F. Supp. 2d 31 (D.D.C. 2013) ........................................................... 4, 11, 19

*United States v. Cal. Rural Legal Assistance, Inc.*,
    722 F.3d 424 (D.C. Cir. 2013) ......................................................... 4, 11, 19, 25

*United States v. Hammond*,
    996 F.3d 374 (7th Cir. 2021) ............................................................................. 14

*United States v. Hunton & Williams*,
    952 F. Supp. 843 (D.D.C. 1997) .............................................................. 4, 11, 19

*United States v. Legal Servs. for N.Y.C.*,
    249 F.3d 1077 (D.C. Cir. 2001) ................................................................ *passim*

*United States v. Legal Servs. for N.Y.C.*,
    100 F. Supp. 2d 42 (D.D.C. 2000) .................................................................... 20

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) .................................................................................. *passim*

*United States v. Powell*,
    379 U.S. 48 (1964) ............................................................................................. 9

*United States v Trader*,
    981 F.3d 961 (11th Cir. 2020) ........................................................................... 14

*Zietzke v. United States*,
    426 F. Supp. 3d 758 (W.D. Wa. 2019) ............................................................. 14

## **Statutes**

15 U.S.C. § 78u ........................................................................................................ 15

15 U.S.C. § 78x ........................................................................................................ 25

**Other Authorities**

Commission Statement and Guidance on Public Company Cybersecurity Disclosures,
Release No. 33-10459 (Feb. 26. 2018) [83 FR 8166]....................................................... 23

D.C. Bar Rule of Professional Conduct 1.6 ................................................................. 18

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................... 5

**Regulations**

17 C.F.R. § 230.122 ...................................................................................................... 25

17 C.F.R. § 240.24c-1 ................................................................................................... 25

17 C.F.R. § 200.735-3 ................................................................................................... 25

The Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this Reply Memorandum of Law in further support of its Application for an Order Compelling Compliance with Investigative Subpoena (ECF 1).[1]  The Commission addresses herein the arguments made by Respondent Covington & Burlington LLP ("Covington") in its Opposition Brief (ECF 14) ("Covington Opposition" or "Cov. Opp.") as well as the arguments set forth in briefs filed by Amici 83 Law Firms (ECF 17) ("Law Firm Brief"), Reporters Committee for Freedom of the Press (ECF 18) ("Reporter Brief"), the Chamber of Commerce (ECF 19) ("Chamber Brief"), and the Association of Corporate Counsel (ECF 26) ("ACC Brief") (collectively, "Amici").

## **INTRODUCTION**

This subpoena enforcement proceeding relates to a major cyberattack that may have compromised material, non-public information ("MNPI") belonging to Covington's public company clients that are regulated by the Commission.  Covington agrees that the Commission has authority to investigate whether any stolen information has been used in violation of the federal securities laws.  But Covington asks the Court to hamstring the investigation because the hacker stole from a law firm.  The Court should reject this request.  Long-settled case law establishes that the Commission may subpoena Covington's business records and learn the identities of the impacted public companies so that the Commission can conduct an effective investigation.

The D.C. Circuit and courts within this District have ruled on multiple occasions that a federal agency may subpoena a law firm's or legal services provider's client list because a client

---

[1]     The Memorandum of Points and Authorities filed in Support of the Application (ECF 1-1) is referred to herein as the "Application."

list does not disclose legal advice or any other privileged information.  *See, e.g.*, *United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1081 (D.C. Cir. 2001) (affirming order requiring legal services provider to comply with an administrative subpoena and produce a client list); *id.* ("Courts have consistently held that the general subject matter of clients' representations are not privileged.") (citation omitted).  And contrary to Covington's assertion, courts apply the same deferential standard in determining whether to enforce administrative subpoenas when an agency seeks client information from a law firm or generally seeks information that could be deemed "private" in some sense (most administrative subpoenas seek information that is non-public). The Supreme Court established that deferential standard in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946), and *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), which the Supreme Court and lower courts have continued to apply over the past 75 years.

Covington attempts to avoid this settled law by citing an easily distinguishable criminal case, *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  *Carpenter* concerned the government's warrantless and covert collection of 127 days' worth of cell phone locational data that provided the government with "near perfect surveillance" of defendant's movements, "as if it had attached an ankle monitor to the phone's user."  138 S. Ct. at 2218.  The kind of extensive information-gathering at issue in *Carpenter* is entirely different from the request for client names before the Court here.  Indeed, the *Carpenter* Court stressed that its opinion was "a narrow one" and that its decision did not apply in other contexts, including even other types of surveillance.  *Id.* at 2220. The decision does not apply to administrative subpoenas that, like the one at issue here, allow the subpoena recipient to challenge the subpoena in federal court before having to provide any information.

Because the law plainly requires Covington's compliance with the subpoena, Covington

and Amici attempt to distract the Court by making hyperbolic and exaggerated claims that the SEC: has engaged in "aggressive and unprecedented tactics"; has attempted to "raid," "rummage," or "rifle through" Covington's confidential client files; wants "to invade a sacred precinct of trust and confidence"; seeks "a piecemeal dismantling of the fundamental protections for attorney-client communications, attorney work product, and client confidences"; seeks "to weaponize information voluntarily reported to the government"; and seeks "to act as an agent of cybersecurity chaos."

These assertions misstate the record.  To be clear: the Commission seeks a <u>list</u> of the 298 public companies that are regulated by the SEC and that may have had their MNPI stolen as part of the cyberattack on Covington's servers ("Impacted Company List").  The SEC is <u>not</u> asking the Court to require Covington to turn over any "client files," "attorney work product," or "attorney-client communications."  The Commission needs this list to fulfill its congressionally-mandated mission of protecting investors and regulating the public securities markets.  And the Commission has subpoenaed Covington because Covington alone possesses this information.

Finally, Covington and Amici advance a hodgepodge of policy arguments in support of replacing a longstanding, settled standard with some new, undefined balancing test for determining the reasonableness of the subpoena.  As discussed herein, those policy contentions mostly rest on false speculation and hyperbole, not fact, and deserve no credit.  Regardless, existing Supreme Court and D.C. Circuit precedents setting forth the standard for enforcement of administrative subpoenas should and do continue to apply.  And Congress has entrusted the Commission with determining the breadth and methods of its securities law enforcement investigations.  *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1031 (D.C. Cir. 1978) ("The breadth of an investigation is for the [SEC] to determine.") (citation omitted).

The Court should compel Covington to comply with the subpoena as narrowed by the Commission in its Application.

## ARGUMENT

### I.   COVINGTON HAS FAILED TO ESTABLISH ANY PRIVILEGE

Covington argues that it should be excused from disclosing the Impacted Company List because it is attorney-client privileged.  Cov. Opp. 19-20.  This contention has no merit. Revealing a client's identity does not require disclosure of any confidential communication between the lawyer and client, and, for that reason, client identity information is not privileged under applicable federal law.  Covington does not attempt to address, let alone distinguish, the myriad cases so holding—including decisions of the D.C. Circuit and courts of this District compelling the production of client lists in the context of administrative subpoenas.  *See, e.g.*, *United States v. Cal. Rural Legal Assistance, Inc.*, 722 F.3d 424, 427-29 (D.C. Cir. 2013) (applying federal law of privilege and affirming order requiring legal services provider to provide client names in response to administrative subpoena);[2] *Legal Servs. for N.Y.C.,* 249 F.3d at 1081 (affirming order requiring legal services agency to disclose client names); *United States v. Hunton & Williams*, 952 F. Supp. 843, 856 (D.D.C. 1997) (ordering law firm to produce client list in response to administrative subpoena and noting the federal rule that "client-identity is not protected by the attorney-client privilege"); *Adair v. Rose Law Firm*, 867 F. Supp. 1111 (D.D.C. 1994) (ordering law firm to produce client list in response to administrative subpoena); *see also, e.g., SEC v. Whittemore*, No. 05-869 (RMC), 2006 WL 8462457, at \*\*1-2 (D.D.C. Oct. 24,

---

[2]     The order affirmed by the D.C. Circuit required not only production of client names but also other client-identifying information, including intake sheets, retainer agreements, and other information about the nature of the representation.  *See United States v. Cal. Rural Legal Assistance, Inc.*, 824 F. Supp. 2d 31, 36-38 (D.D.C. 2011).

2006) (granting SEC's motion to compel the identity of law firm client and noting that "[a]lthough the name of a client is confidential, it is not protected by the attorney-client privilege").

Against the backdrop of this case law and the maxim that privilege assertions should be "strictly confined within the narrowest possible limits," *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998) (citation and quotation marks omitted), Covington argues that an "exception" to the general rule applies where "a client's identity is sufficiently intertwined with the client's confidences." Cov. Opp. 19. Covington claims that client identity and confidences are intertwined here because: (1) the subpoena "is only the first step toward an inevitable demand for privileged information and work product," and (2) the Impacted Company List "will effectively reveal the content of privileged client communications either in whole or in part." Cov. Opp. 19-20. Both assertions are incorrect, and any "exception" accordingly does not apply.[3]

First, Covington's assertion that the subpoena is a "first step toward an inevitable demand for privileged information" is incorrect and reflects a lack of understanding of the Commission's investigative tools. Regardless, if Covington believes that any future request seeks privileged information, Covington may object to the request and refuse to produce the documents over which it asserts privilege. The Commission's only recourse in such a situation (assuming the

---

[3]     Covington cites just one case in support of the claimed "exception." *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018). Cov. Opp. 19-20. That case concerned the government's FOIA obligations, not an administrative subpoena. In the context of a litigation or a formal agency investigation, like the one at issue here, a party generally cannot avoid disclosing the <u>fact</u> of a privileged communication, the parties to that communication, and the general nature of that communication; for this reason, parties must prepare and disclose privilege logs identifying the nature, date, and recipients of privileged communications. Fed. R. Civ. P. 26(b)(5); *see also Legal Servs. for N.Y.C.*, 249 F.3d at 1081 ("Courts have consistently held that the general subject matters of clients' representations are not privileged.") (citation omitted).

Commission were to disagree with the privilege assertion) would be a subpoena enforcement action like this one, and Covington and its clients would receive judicial protection from any agency overreach.  *See Arthur Young*, 584 F.2d at 1028 (rejecting concern about an "overzealous" SEC staff, noting that "so long as the courts retain their power of individual inquiry prior to enforcement of administrative subpoenas, there is relatively little for anyone to fear").  Moreover, Covington's speculation that the Commission <u>might</u> issue future investigative subpoenas that <u>might</u> seek privileged information does not address the question before this Court—whether the Impacted Company List itself is privileged.

Second, the Impacted Company List will not "effectively reveal the content of privileged client communications."  Covington contends that the Commission <u>might</u> be able to <u>guess</u> "which clients received specific information and advice from Covington in connection with the cyberattack."  Cov. Opp. 20.  But Covington does not explain the basis for this speculation. Even if the speculation had some foundation, which it does not, the fact that a public company client had communications with Covington about the cyberattack says nothing about the nature or substance of Covington's legal advice (if any was provided).  *See Taylor Lohmeyer Law Firm P.L.L.C. v. United States*, 957 F.3d 505, 513 (5th Cir. 2020) (enforcing administrative subpoena to law firm seeking client information and rejecting argument that client identities were "connected inextricably with a privileged communication" where it was "less than clear" what legal advice may have been provided); *FTC v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016) ("It is not sufficient to show merely that the communication was between client and attorney.").

In short, Covington has failed to satisfy its burden, presenting only speculation in support of its assertion that the Impacted Company List is privileged—speculation that the Commission

might seek privileged information in the future or might be able to guess which clients received advice (but not the content of that advice). This is insufficient. *See, e.g., In re Veiga*, 746 F. Supp. 2d 27, 34 (D.D.C. 2010) ("[T]he proponent of the privilege must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel. Where the proponent fails to adduce sufficient facts to permit the court to conclude with reasonable certainty that the privilege applies, its burden is not met.") (citations omitted).

## II.     THE COURT SHOULD APPLY THE LONG-SETTLED STANDARD FOR ENFORCING ADMINISTRATIVE SUBPOENAS

Because Covington has failed to establish that the Impacted Company List is privileged, Covington must produce the list under well-established law. The Court should reject Covington's and Amici's invitation to ignore that law.

### A.      Under Controlling Precedent, Administrative Subpoenas Satisfy The Fourth Amendment If The Agency Has Authority To Issue The Subpoena And The Requests Are "Not Too Indefinite" And "Reasonably Relevant"

The Commission here has subpoenaed a Covington business record listing certain Covington clients. Like many business records that agencies subpoena with frequency, this list may be non-public and thus can be labeled as "private." But under the law that has developed over the past 75 years, such records are not shielded simply because a subpoena recipient deems them "private" so long as the agency has authority for issuing the subpoena, the request is "not too indefinite," and the information sought is "reasonably relevant" to the investigation and therefore not unduly burdensome.

In *Oklahoma Press*, the Supreme Court affirmed an order compelling a newspaper publishing company to respond to an administrative subpoena seeking confidential personnel records notwithstanding the purported First and Fourth Amendment rights at stake. The Court rejected the argument that, as in the case of a warrant, the agency needed to establish probable

cause: "It is enough that the investigation be for a lawfully authorized purpose, within the power

of Congress to command."  327 U.S. at 209.  As explained by the Court, the subpoena

commences a process of judicial review that addresses the Fourth Amendment requirement that

the governmental request for papers be reasonable.  According to the Court, in the context of an

administrative subpoena, the Fourth Amendment "guards against abuse only by way of too much

indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is

one the demanding agency is authorized by law to make and the materials specified are

relevant."  *Id*. at 208.

 The Court in *Morton Salt* addressed similar arguments that the agency had gone too far,

in violation of the Fourth Amendment, in seeking non-public business records based on

"suspicion" and "curiosity."  338 U.S. at 640.  The Court rejected those arguments, explaining

that the agency could "investigate merely on suspicion that the law is being violated, or even just

because it wants assurance that it is not."  *Id*. at 642-643.  Per the Court, an agency subpoena

must be enforced where (1) "the inquiry is within the authority of the agency," (2) "the demand

is not too indefinite," and (3) "the information sought is reasonably relevant."  *Id*. at 652-53.

The Supreme Court has repeatedly reaffirmed these rulings.  For example, in *City of Los

Angeles v. Patel*, the Court considered and struck down a law that required hotels to make their

guest registries available for unfettered inspection by the police.  576 U.S. 409 (2015).  Notably,

the Court explained that administrative subpoenas provided a constitutional method to obtain

such "private" business records "without probable cause that a regulation is being infringed" and

are "one way in which an opportunity for precompliance review can be made available."[4]  *Id*. at

---

[4]     Covington agrees that the records at issue in *Patel* implicated privacy issues similar to
those at issue in this case but fails to acknowledge the distinction the Supreme Court drew for

421, 423; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414-15 (1984) (reaffirming

holding in *Oklahoma Press*); *See v. City of Seattle*, 387 U.S. 541, 544 (1967) (describing *Morton

Salt* as "settled" law "when an administrative agency subpoenas corporate books or records");

*United States v. Powell*, 379 U.S. 48, 51, 57-58 (1964) (rejecting "probable cause standard" for

enforcing IRS administrative summonses, citing *Oklahoma Press*); *Penfield Co. v. SEC*, 330

U.S. 585, 591 (1947) (citing *Oklahoma Press* and stating that the Commission was "entitled to

the aid of the court" in obtaining subpoenaed material).

      The lower courts have applied—and continue to apply—the three-part *Morton Salt* test in

deciding to enforce administrative investigative subpoenas.  "So long as the material the

Commission seeks is relevant to the <u>investigation</u>—the boundary of which may be defined quite

generally[—]the district court must enforce the agency's demand."  *FTC v. Church & Dwight

Co., Inc.*, 665 F.3d 1312, 1316 (D.C. Cir. 2011) (emphasis in original; citations and quotation

marks omitted).  Courts presume enforcement of administrative subpoenas, giving "broad

deference" to the agency.  *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir.

1992); *CFTC v. First State Depository Co., LLC*, No. 21-mc-048 (JEB/GMH), 2021 WL

7448016, at *3 (D.D.C. June 23, 2021) (same).  An agency's subpoena authority is especially

broad in the pre-complaint investigation stage, as is the case here, when the agency "is under no

obligation to propound a narrowly focused theory of a possible future case."  *CFTC v. Ekasala*,

62 F. Supp. 3d 88, 93 (D.D.C. 2014) (citation omitted); *see also, e.g.*, *FTC v. Platinum Plus

Printing, LLC*, No. 21-92 (RDM), 2021 WL 3363416, at *4 (D.D.C. Aug. 3, 2021) ("It is well

established that a district court must enforce a federal agency's investigative subpoena if the

_____

administrative subpoenas.  *See* Cov. Opp. 27-28 (discussing lower court decision in *Patel* as
support for the proposition that Covington's lawyers "retain an independent interest in the
privacy of their business records, including client names").

information sought is 'reasonably relevant.'") (citations omitted).

The subpoena here seeks information "reasonably relevant" to the SEC's investigation into whether the Hafnium cyberattack has resulted in violations of the federal securities laws to the detriment of markets, investors, and other market participants.  The Commission needs to know which public companies may have had their MNPI compromised in order to identify, *inter alia*, suspicious trading in those companies' securities.  Application at 7-9.

B.     **The D.C. Circuit Applies *Oklahoma Press* And *Morton Salt* To Administrative Subpoenas Seeking "Private" Information, Including Subpoenas To Law Firms**

Covington argues that this well-established law does not apply here because the SEC seeks "private" information held by a third party, contending that the standard established by the Supreme Court is too "government friendly."  But as described above, *Oklahoma Press* and *Morton Salt* concerned requests for non-public records, and, consistent with Supreme Court precedent, federal courts (including the D.C. Circuit) apply the *Oklahoma Press* and *Morton Salt* test regardless of whether the subpoena seeks information that the subpoena recipient may consider "private."  *See In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1416 (D.C. Cir. 1994) (rejecting argument for different standard for subpoenaing private financial information, noting that "nothing in *Morton Salt* or in the agency's authorizing statutes imposes such a requirement"); *RTC v. Walde*, 18 F.3d 943, 946-47 (D.C. Cir. 1994) (applying *Morton Salt* test where agency sought private financial information).[5]

---

[5]     Covington cites *In re McVane*, 44 F.3d 1127 (2d Cir. 1995), for the proposition that courts apply "more exacting scrutiny" where privacy interests are implicated.  Cov. Opp. 21. Covington fails to mention that *McVane* itself recognized that courts have "applied the lenient *Morton Salt* test to administrative subpoenas seeking personal records."  44 F.3d at 1137. Further, *McVane* makes clear that the *Morton Salt* test applies to subpoenas seeking information about businesses.  *Id.* at 1136-37.

Indeed, the cases most analogous to this one—those involving administrative subpoenas to law firms and legal services providers in which the agency has sought the production of client information—have applied the *Morton Salt* factors.  *See Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997) (applying *Morton Salt* when addressing an administrative subpoena to a law firm seeking attorney work product);[6] *see also Legal Servs. for N.Y.C.,* 249 F.3d at 1083 (applying *Morton Salt* and ordering compliance with administrative subpoena demanding client names and the nature of the client representations); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1513, 1516-17 (D.C. Cir. 1993) (applying *Oklahoma Press* and ordering law firm to produce client information); *Hunton & Williams*, 952 F. Supp. at 848 (ordering law firm to produce client list because the administrative subpoena "meets all three of [the *Morton Salt*] requirements"); *Adair*, 867 F. Supp. at 1119-20 (applying *Morton Salt* and ordering production of law firm's client list); *Cal. Rural Legal Assistance*, 824 F. Supp. 2d at 40 (ordering legal services provider to produce client list and other client information and applying *Morton Salt* factors), *affirmed in relevant part by* 722 F.3d 424.

## C.   *Carpenter* **Does Not Apply Here**

Covington and Amici contend that the long-settled standard for enforcement of administrative subpoenas no longer applies in light of the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  For at least three different reasons, they are wrong: *Carpenter* is (1) inapposite and inapplicable, (2) "narrow," and (3) in the context of administrative subpoenas, incompatible with congressional intent.

---

[6]     The court ultimately affirmed the district court's order excusing compliance with the subpoena because the government failed to establish a need for the work product sufficient to overcome the privilege.

1.     The Facts In *Carpenter* Differ Significantly From The Facts In This Proceeding

The Supreme Court in *Carpenter* addressed a criminal defendant's contention that the government had violated his Fourth Amendment rights in its warrantless gathering of 127 days of historical cell phone locational data, obtained *ex parte* through a statutory provision that authorized the issuance of judicial orders for searches with a showing that fell "well short of the probable cause required for a warrant." 138 S. Ct. at 2221. That data provided an "all-encompassing record of [defendant's] whereabouts[,] … revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id*. at 2217 (citation omitted). The government accomplished "near perfect surveillance" of defendant's movements with the data, "as if it had attached an ankle monitor to the phone's user." *Id*. at 2218. According to the Court, this locational data amounted to a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id*. at 2220. The Court held that the government could obtain such highly personal, invasive information only by obtaining a warrant supported by probable cause. *Id*. at 2221.

The facts in this subpoena enforcement proceeding in no way resemble the facts in *Carpenter*. The Commission seeks a Covington business record: a list of public companies regulated by the Commission who may have had material, market-sensitive data stolen in a cyberattack. Unlike in *Carpenter*, the SEC does not seek information about any individual person, let alone information providing "near perfect surveillance" of such person amounting to a "detailed chronical of [that] person's physical presence … every day, every moment, over several years." Nor does the Commission seek panoptic information about the functions, operations, or legal issues facing Covington's corporate clients. The privacy interests animating

the Court in *Carpenter* are wholly absent here. *See Walde*, 18 F.3d at 948 ("The Supreme Court reminds us that 'corporations can claim no equality with individuals in the enjoyment of a right to privacy.'") (quoting *Morton Salt*, 338 U.S. at 652).

Moreover, the SEC's subpoena provided notice to Covington, an opportunity for Covington to object, and judicial review, in contrast to the process at issue in *Carpenter* where the defendant had no advance notice of the government's surveillance. The adversarial judicial process required for enforcing administrative subpoenas makes such subpoenas different from "cases of actual search and seizure" by the government of papers or effects, as to which the Fourth Amendment requires a warrant supported by probable cause. *Oklahoma Press*, 327 U.S. at 202. In the context of administrative subpoenas, "the Fourth [Amendment], if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials are relevant." *Id*. at 208; *see also Patel,* 576 U.S. at 421-23 (explaining that administrative subpoenas satisfy the Fourth Amendment because they provide an opportunity for "precompliance review"); *In re Subpoena Duces Tecum*, 228 F.3d 341, 346-49 (4th Cir. 2000) (explaining the distinction between subpoenas and *ex parte* searches and noting that, in context of administrative subpoenas, governmental power is constrained through judicial supervision).

    2.    <u>*Carpenter* Is Limited To The "Narrow" Context In Which The Government Obtains Cell Phone Locational Information Without A Warrant</u>

The *Carpenter* Court took pains to emphasize that its holding sought to protect the privacy interests of <u>individual</u> "suspects" in a criminal proceeding, limiting its holding to an "individual['s] … legitimate expectation of privacy in the record of his physical movements as

captured through [cell phone locational data]."  138 S. Ct. at 2217.  This holding flowed from the Court's concern about the "intimate window into a person's life" provided by cell phone locational data.  *Id*. (citation omitted).  As the Court itself acknowledged, this holding was "a narrow one."  *Id*. at 2220.  To drive home the narrowness of its ruling, the Court further clarified that it did "not express a view on matters not before us."  *Id*.  Nor did the Court purport to overrule any prior precedent.

Numerous decisions have recognized *Carpenter*'s limited reach, even in cases like *Carpenter* involving information gathering in the criminal context.  *See, e.g.*, *Kleiser v. Chavez*, 55 F.4th 782, 783-84 (9th Cir. 2022) (refusing to extend "narrow" ruling in *Carpenter* to private search exception); *United States v. Hammond*, 996 F.3d 374 (7th Cir. 2021) (refusing to extend *Carpenter* to the collection of real-time cell phone locational data), *cert. denied*, 142 S. Ct. 2646 (2022); *United States v Trader*, 981 F.3d 961, 968 (11th Cir. 2020) ("*Carpenter's* 'narrow' exception … applies only to some cell-site location information, not to ordinary business records like email addresses and internet protocol addresses"); *Zietzke v. United States*, 426 F. Supp. 3d 758, 768 (W.D. Wa. 2019) (limiting *Carpenter* to "surveillance").

The Court should reject Covington's and Amici's aggressive and wholly unsupported effort to apply the Supreme Court's expressly limited holding in *Carpenter* to the administrative subpoena at issue here.  The *Morton Salt* standard determines the enforceability of the Commission's subpoena.  *See, e.g., Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding authority must be followed unless and until overruled by a body competent to do so.").

       3.    Extending *Carpenter* Would Upend The SEC's Ability To Investigate Violations Of The Federal Securities Laws

*Carpenter's* explicitly narrow holding should not be overextended here for an additional reason: Stretching the decision to subpoena enforcement actions would obstruct the

Commission's (and similar agencies') broad investigatory powers, contrary to congressional intent.  *See Arthur Young*, 584 F.2d at 1023 ("Congress has endowed the [SEC], not unlike other agencies, with broad power to conduct investigations such as it deems necessary to ferret out violations of the federal securities laws and implementing regulations, whether consummated or incipient and in that connection to call for production of relevant materials by those who seem to have them.") (citations and quotation marks omitted).  Those broad powers include "mak[ing] such investigations [the SEC] deems necessary to determine whether any person has violated, is violating, or is about to violate" the securities laws.  15 U.S.C. § 78u(a)(1).  "For the purpose of any such investigation … [the SEC may] … require the production of any books, papers, correspondence, memoranda, or other records which the Commission deems relevant or material to the inquiry."  *Id*. § 78u(b).

The Commission routinely seeks non-public financial information and communications in order to satisfy its congressional mandate to enforce the securities laws.  Some examples of routine SEC investigations involving private information include: insider trading investigations, in which communications between the suspected tipper and tippee have relevance; or Ponzi scheme investigations, where communications between the promoter and victims of the suspected scheme have import.

*Carpenter's* warrant and probable cause requirements, if made applicable to situations in which the Commission seeks information over which some party has a claimed expectation of privacy, would severely hamstring the SEC's ability to investigate fraudulent schemes involving securities and other suspected violations of the securities laws as few investigations begin with "probable cause" of a securities law violation.  *Cf. In re Subpoena Duces Tecum*, 228 F.3d at 348 ("If [the subpoena recipient] were correct in his assertion that investigative subpoenas may be

issued only upon probable cause, the result would be the virtual end to any investigatory efforts by governmental agencies, as well as grand juries.").  Indeed, the Commission has no authority to obtain a search warrant and therefore could not satisfy *Carpenter's* warrant requirement <u>even if</u> probable cause of a securities law violation existed.

> **D.**    **Covington's Request For An Undefined Balancing Test Has No Merit**

Covington itself appears to recognize that *Carpenter* should not be applied in the context of administrative subpoenas like the one at issue here.  Covington does not assert that *Carpenter* somehow precludes the Commission's subpoena, but rather that this Court needs to conduct "a robust reasonableness review" in light of *Carpenter*.  Cov. Opp. 29.  But *Carpenter*, which turns wholly on the "unique nature of cell phone location information," 138 S. Ct. at 2220, does not mention or require "a robust reasonableness review" for other types of business records.

Covington cites no cases describing this "robust reasonableness review" for administrative subpoenas—none exists—and instead relies on decisions like *Camara v. Municipal Court of San Francisco*, 387 U.S. 523 (1967), which concerns the standard for <u>physical intrusions</u> and searches on property (*e.g.*, inspections) by administrative agencies. Unlike the actual "raid" at issue in *Camara*, Cov. Opp. 29, the Commission did not bang on Covington's doors; it served a piece of paper that led to this current process of judicial review. This Court should not adopt Covington's proposed "robust reasonableness review" and make new law out of whole cloth—particularly when that new law would undermine the SEC's broad discretion to conduct investigations as delegated by Congress.[7]

---

[7]    Covington wants the Court to balance the Commission's need for the Impacted Company List against the purported privacy interest at stake.  Cov. Opp. 30.  No case law supports such a balancing test—in any context, let alone here.  As the cases cited by Covington demonstrate, Cov. Opp. 30, the Supreme Court has purported to balance governmental and privacy interests in

III.    **THE COURT SHOULD COMPEL COVINGTON'S COMPLIANCE WITH THE SEC'S INVESTIGATIVE SUBPOENA**

The Court should order Covington to produce the Impacted Company List.  This limited, narrowly tailored request easily satisfies the three *Morton Salt* factors as described in the Application at 6-12.  Indeed, Covington presents no argument in opposition, and therefore concedes, that the first two *Morton Salt* factors are satisfied here:  (1) the SEC has authority for its inquiry, and (2) the SEC's demand is not too indefinite.  Cov. Opp. 41-44.

Covington argues only that compliance with the subpoena should be excused because producing the Impacted Company List would be "unreasonable and unduly burdensome," and therefore the request is not reasonably relevant.  Cov. Opp. 41.  According to Covington, the unreasonable burdens resulting from subpoena compliance include the "burdens on the attorney-client relationship" as well as Covington's "substantial costs"[8] in resisting disclosure of the

---

determining when a <u>category</u> of warrantless search or seizure may be constitutional—<u>but this "balancing" is not done on a case-by-case basis</u>, which would destroy consistent judicial outcomes.  For example, the Supreme Court "balanced" governmental and privacy interests in holding that the police may not randomly pull over a car to determine whether the driver is licensed; instead, the police must have a "reasonable suspicion" that the driver is unlicensed before making the stop.  *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  In light of this precedent, courts do not "balance" governmental and privacy interests in determining whether a particular traffic stop is constitutional; they instead apply the "reasonable suspicion" test.  *See also Maryland v. King*, 569 U.S. 435 (2013) ("balancing" interests and setting forth categorical rule that government may swab an individual for DNA following arrest for serious offense; no case-by-case balancing); *Camara*, 387 U.S. at 536-37 ("balancing" interests and setting forth categorical rule that health and safety inspections of dwellings require a warrant; no case-by-case balancing).  In the context of administrative subpoenas, the Supreme Court has "balanced" governmental and privacy interests and determined that such subpoenas are reasonable and should be enforced when they satisfy the three *Morton Salt* factors.  *Supra* at 7-9.

[8]    Covington claims that it "undertook an exhaustive review of its compromised client files, involving at least 490 hours of attorney time, confirming that only a tiny fraction of affected clients had files that even potentially contained MNPI."  Cov. Opp. 42.  These actions, apparently undertaken to convince the Commission to forego enforcement of the subpoena, do not reflect any burden associated with subpoena compliance and therefore lack relevance.

Impacted Company List, including to satisfy its supposed ethical obligations under D.C. Bar

Rule of Professional Conduct 1.6 ("Rule 1.6").  Cov. Opp. 42.[9]

      The D.C. Circuit considered and rejected this argument in *Legal Services for New York*

*City*.  Like Covington, the legal services provider in that case argued that an administrative

subpoena harmed the attorney-client relationship, including the "ability to assure clients of the

secrecy of their communications," and therefore was "unduly burdensome."  249 F.3d at 1084.

The D.C. Circuit described this argument as "novel" and without basis.  *Id*.  According to the

court, any burden was "undue" only if "compliance threatened to unduly disrupt or seriously

hinder normal operations," a threshold which the production of client names and descriptions of

the client representations did not meet.  *Id*. (quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 882

(D.C. Cir. 1977) (en banc)).  The court further held that the subpoena was "wholly consistent

with the rules governing client secrets and generally consistent with the attorney-client privilege,

so it in no way alters the degree of secrecy appellant can justifiably promise its clients."  *Id*.

("We cannot say that the remote possibility of a linkage between client identity and [the nature of

the client representation] 'unduly disrupts or seriously hinders' appellant's provision of legal

---

[9]     Covington exaggerates any costs and burdens of complying with Rule 1.6.  At most, Rule 1.6 required only that Covington object to the subpoena, forcing the Commission to initiate this proceeding.  Rule 1.6 ceased having any application upon the filing of this case.  *See* Rule 1.6, Cmt. 6 (explaining that the attorney-client privilege and work product doctrine apply in the context of judicial proceedings, not Rule 1.6 confidentiality principles); *see also, e.g., Barback v. Fisher*, No. 20-515, 2022 WL 965914, at *6 (M.D. La. March 30, 2022) ("Rule 1.6 does not preclude an attorney from producing evidence in a judicial proceeding" even without the consent of a law firm's clients) (citations omitted); *FTC v. Trudeau*, No. 03 C 3904, 2013 WL 842599, at *4 (N.D. Ill. Mar. 6, 2013) ("Rule 1.6 is not intended to, and does not apply to judicial proceedings in which a lawyer may be required to produce evidence concerning a client") (citation and quotation marks omitted).  Moreover, and regardless, there is no "undue burden" in supplying the Commission with a single document already in Covington's possession.  That Covington voluntarily incurred expense in advance of this subpoena enforcement action is beside the point.

services.").

Other decisions from the D.C. Circuit and courts within this District similarly have found no "undue burden" in disclosing client identities.  For example, the court in *California Rural Legal Assistance* rejected the legal services provider's argument of undue burden where the provider estimated that the agency's request for client names and other client information would require review of "approximately 39,000 individual hard copy case files for potentially privileged information prior to disclosure… requiring expenditures potentially in excess of $1 million if outside contract attorneys are engaged to handle the review, or, if [the provider's] attorneys conduct the review themselves, requiring over 3,200 hours of attorney time and 4,800 to 7,800 hours of staff time for records handling and support."  824 F. Supp. 2d at 46, *affirmed in relevant part by* 722 F.3d 424; *see also Linde Thomson,* 5 F.3d at 1517 (rejecting law firm's undue burden claim and noting that "proving undue hardship 'is not easily met where … the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose'") (citation omitted); *Hunton & Williams*, 952 F. Supp. at 855 (rejecting argument that having to contact clients prior to production of client list was unduly burdensome); *Adair*, 867 F. Supp. at 1120 (ordering production of a client list notwithstanding the court's concern that disclosure of the client list, due to law firm's relationship to the Whitewater investigation, could "harm the [law firm] in its business and in its relationship with its clients and could also harm the clients whose names are disclosed").

Covington has presented no valid arguments for excusing its performance with the subpoena.  The Court should order production of the Impacted Company List.

19

## IV.     THE POLICY ARGUMENTS ADVANCED BY COVINGTON AND AMICI LACK MERIT

Covington and Amici separately set forth a host of policy arguments in which they question the wisdom of the subpoena and ask the Court to substitute its judgment for the Commission's in matters of securities law enforcement.  These speculative and unsupported policy assertions are beside the point because Congress entrusted the Commission, and not the courts, with the authority to make policy judgments regarding the breadth of its investigations. *See, e.g., Arthur Young*, 584 F.2d at 1031 ("The breadth of an investigation is for the [SEC] to determine."); *United States v. Legal Servs. for N.Y.C.*, 100 F. Supp. 2d 42, 47 (D.D.C. 2000) (upholding administrative subpoena requiring the production of a client list and noting that "[i]t is not the province of this court to decide the best way for [the agency] to carry out its responsibilities."), *affirmed by* 249 F.3d 1077.  In any event, the policy arguments that Covington and Amici raise lack merit.

### A.     The SEC Has Law Enforcement Interests Distinct From The Department Of Justice And FBI And Pursues Its Investigations Independently Of Criminal Law Enforcement Authorities

Covington and Amici argue that enforcing the subpoena will undermine law enforcement efforts in the cybersecurity field by providing a disincentive for law firms to "act as good citizens" and cooperate with law enforcement.[10]  *See* Cov. Opp. 39-40; Law Firm Brief 11-12. In support of their arguments, Covington and Amici point to the U.S. Department of Justice's ("DOJ") policy regarding cyberattack investigations, as well as recent statements made by the

---

[10]     Amici Chamber and ACC also argue that the subpoena enforcement action will have a chilling effect on companies that are the victims of cyberattacks, making them less likely to seek counsel to represent them in connection with such attacks.  *See* Chamber Brief 8; ACC Brief 16. Amici misstate what is sought in this subpoena enforcement action.  Contrary to Amici's assertion, the Commission has not sought any information from lawyers who were retained for purposes of responding to the cyberattack.

Director of the Federal Bureau of Investigation ("FBI"), and assert that the SEC should follow the lead of criminal authorities by going after the "bad guys."

The DOJ and the Commission are tasked with different responsibilities, and they seek to achieve their respective goals through different policies, priorities, and investigative methods. And while the FBI and the DOJ are tasked with pursuing federal crimes, including cyberattacks, the SEC's mission is focused on investor protection, especially in the context of public companies regulated by the Commission. A major cyberattack that exposes the non-public data of hundreds of public companies has implications for shareholders, potential investors, and market integrity, and demands further investigation by the federal agency charged with investor protection and market regulation.

In connection with its mission, the Commission maintains a distinct interest in pursuing illegal trading based on non-public information obtained by threat actors during a cyberattack, potential insider trading by executives at companies that were impacted by such cyberattacks, and ensuring that investors who invest in public companies receive full and fair disclosure of material impacts caused by cyberattacks. Far from "shaming," "victimizing" or "punishing" Covington as a result of the cyberattack, the Commission seeks to ensure that innocent investors do not pay the price for unlawful acts that often accompany cyberattacks.

Nor may the Commission rely on Covington's representation that the threat actors sought information only of interest to China. Cov. Opp. 7-8. Threat actors may have multiple purposes for launching a cyberattack, and, by Covington's own admission, at least seven companies may have had MNPI compromised. Even if the initial goal was political espionage, the SEC cannot assume that the threat actors put on blinders and did not attempt to monetize the compromised MNPI. The Commission has a duty to conduct its own investigation and to ensure that the

21

cyberattack has not harmed markets and investors.

**B.      The SEC Is Fulfilling Its Congressionally Mandated Mission Of Protecting Investors And Regulating Market Participants**

Amici also assert that the SEC is somehow "improperly inserting itself" as a cybersecurity regulator by seeking the names of public companies whose information may have been accessed by threat actors.  *See* Chamber Brief 22.  This argument seems to imply that only the Department of Homeland Security, the FBI, and the DOJ can investigate the impact of cybercrimes in the United States, and that other federal agencies who regulate entities impacted by cybersecurity incidents have no business investigating such incidents.  The argument takes an incorrect and overly restrictive view of the relationship between independent federal law enforcement agencies.

Contrary to Amici's assertions, the SEC has an active role to play in the investigation and enforcement of securities law violations arising from cybersecurity incidents such as the Hafnium cyberattack.  The SEC has actively pursued that role for years now.  *See* Application at 2.  Indeed, the ACC Brief articulates precisely these concerns as the Commission's "legitimate cybersecurity responsibilities."  *See* ACC Brief 2-3 (listing the Commission's "legitimate cybersecurity responsibilities" to include "protect[ing] market integrity against the prospect of insider trading enabled by security breaches and ensur[ing] that investors receive material information related to public companies' cybersecurity risks and incidents.").

The Commission's legitimate interest in investigating these areas is not new, controversial, or an improper attempt to insert itself into a larger role as a cybersecurity enforcer.  The Commission instead is carrying out its traditional missions of investor protection and market regulation in light of the reality that cybersecurity events affect public companies, their

shareholders, and other regulated entities.[11]  In keeping with its limited mission in the cybersecurity sphere, the Commission has specifically tailored its request to determining the impact of the breach on public companies regulated by the Commission.

      **C.**    **The Present Subpoena Enforcement Action Has Limited Implications Outside The Specific Factual Context Of This Matter**

Covington and Amici offer up a "parade of horribles" that allegedly will occur if Covington is required to provide the names of public companies whose information was accessed when the threat actors gained access to Covington's systems.  Among other things, Covington and Amici assert that reporters and law firms will become regular targets of SEC subpoenas and that the courts will become overburdened with subpoena enforcement actions by administrative agencies seeking access to law firm and reporter records.  Cov. Opp. 38-39; Reporter Brief 17-18; Law Firm Brief 11-12.

No facts support this unfounded speculation.  Cyberattacks are not some new phenomenon.  To the contrary, Appendix A to Covington's Opposition identifies 114 law firms as having suffered recent cyberattacks from 2020-2022.  Tellingly, Covington and Amici fail to point to any evidence that the SEC has been "targeting" law firms and reporters and overburdening the courts.  Nor do Amici point to instances beyond 2006 when the agency has served subpoenas on reporters or media organizations seeking confidential sources.

---

[11]    *See, e.g.,* Commission Statement and Guidance on Public Company Cybersecurity Disclosures, Release No. 33-10459 (Feb. 26, 2018) at 1-2 [83 FR 8166], available at www.sec.gov/rules/interp/2018/33-10459.pdf ("Cybersecurity risks pose grave threats to investors, our capital markets, and our country…. Companies today rely on digital technology to conduct their business operations and engage with their customers, business partners, and other constituencies. In a digitally connected world, cybersecurity presents ongoing risks and threats to our capital markets and to companies operating in all industries, including public companies regulated by the Commission.").

**D.    The SEC Has No Other Means To Obtain The Names Of Public Companies Impacted By The Cyberattack Against Covington, Contrary To The Statements Of Covington And Amici**

Whether intentionally or through lack of understanding, Covington and Amici paint an inaccurate picture of the SEC's ability to independently obtain the information sought in the subpoena.  Among other things, Covington suggests that the SEC could use its "specialized tool" and FINRA market surveillance "to determine unusual trading patterns" to investigate, and that the SEC could then "mine court appearances, securities filings, or other public records to identify clients whose affiliation with Covington may have already become public."  Cov. Opp. 35-36.

But there is no simple formula for identifying "unusual trading patterns," particularly where the relationship between independent public companies is not readily apparent.  Indeed, in this case, the key factor that would make the trading unusual would be the fact that the same or related parties were trading in shares of multiple Covington clients impacted by the data breach.  Yet without knowing the identities of the issuers and the fact that their information was accessed during the breach, the Commission has no way to conduct that analysis.

In addition, as Covington admits in its filing, any Commission "mining" of "court appearances, securities filings, and public records" to identify Covington clients would be both over- and under-inclusive.  *See* Cov. Opp. 43-44 (describing the inherent shortcomings of mining public data to determine whether client information was accessed in connection with the cyberattack).  First, the Commission would likely identify numerous Covington clients who were not impacted by the breach, making trading in their shares irrelevant to any analysis of potential unlawful trading.  Second, Covington's representation of the clients in certain instances may not be publicly reported (*e.g.*, in a non-public investigation), in which case the Commission's dataset for any trading analysis would be incomplete.  In both scenarios, any evaluation of whether there

was trading based on MNPI obtained from the Covington hack would be highly ineffective and constrained from the start.

### E.     The SEC's Investigation Is Non-Public And Confidential

Finally, Covington and Amici Law Firms express the concern that the Commission may disseminate client identities, including to "members of Congress, the press and the public."  Cov. Opp. 28; Law Firm Brief 5-6.  The concerns are unfounded.  The Commission conducts non-public, confidential investigations and, as required by law, safeguards confidential information received by it.  15 U.S.C. § 78x(b); 17 C.F.R. §§ 200.735-3, 230.122, 240.24c-1; *cf. Cal. Rural Legal Assistance*, 722 F.3d at 429 ("It is well established that it is the agencies, not the courts, which should, in the first instance, establish procedures for safeguarding confidentiality.") (citation and quotation marks omitted).

### <u>CONCLUSION</u>

For all of the above reasons and those set forth in the Application and supporting papers, the Court should grant the Application and order compliance with the Commission's investigative subpoena, as limited by the Application.

Dated:  March 14, 2023                        Respectfully submitted,

                                                        */s/ Eugene N. Hansen*
                                                        EUGENE N. HANSEN (DC Bar 483638)
                                                        LORY C. STONE (DC Bar 498400)
                                                        Securities and Exchange Commission
                                                        100 F. Street N.E.
                                                        Washington, D.C. 20549
                                                        Tel. 202.551.6091
                                                        Email: hansene@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2023, I caused the foregoing Reply Memorandum of Law in Further Support of Securities and Exchange Commission's Application for Order Compelling Compliance with Investigative Subpoena to be filed and served on all counsel of record via CM/ECF.

*/s/ Eugene N. Hansen*
_____
